**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | |
|---|---|
| **NDIVE MONGO LAMBERT**<br>**3003 Castle Garden Way**<br>**Olney, MD 20832-1432**<br><br>Plaintiff,<br><br>v.<br><br>**SAVASENIORCARE**<br>**ADMINISTRATIVE SERVICES, LLC**<br>**c/o The Corporation Trust Company**<br>**Corporation Trust Center**<br>**1209 Orange Street**<br>**Wilmington, DE 19801-1196**<br><br>and<br><br>**SSC LAUREL OPERATING COMPANY LLC**<br>**c/o The Corporation Trust Company**<br>**Corporation Trust Center**<br>**1209 Orange Street**<br>**Wilmington, DE 19801-1196**<br><br>Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff, Ndive Mongo Lambert ("Plaintiff" or "Mr. Lambert"), by his undersigned

Counsel, files this Complaint against SavaSeniorCare Administrative Services, LLC and SSC

Laurel Operating Company LLC, ("Defendants" or "SSC"), for unlawful and discriminatory

employment actions, on the basis of his race (African American/Black) sex (male), color (black),

national origin (Cameroonian), harassment and retaliation in violation of Title VII of The Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., Section 1981 (42 U.S.C § 1981, the

Md. Code Ann. State Gov't §20-601 et seq., for interfering with his rights under the FMLA, 29

U.S.C. §§ 2601 et seq., and for Intentional Infliction of Emotional Distress under Maryland law.

1.      Plaintiff has the right to bring this action. He has exhausted his administrative remedies

by filing a charge against Defendants with the EEOC. On June 19, 2020, the EEOC, issued Mr.

Lambert Right to Sue Letter, post-dated June 20, 2020, which he received on June 24, 2020.

Thus, this Complaint is timely. **See Exhibit A.**

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action and Plaintiff's claims under 28 U.S.C. § 1331.

The Court also has Supplemental jurisdiction under 28 U.S. Code §1367.

3.      Venue is proper in the United States District Court, District of Maryland, Southern

Division, in Greenbelt pursuant to 28 U.S.C. § 1391. Plaintiff resides in Maryland, and all the

actions against him arose, and took place in Maryland where he was employed by the Defendant.

## PARTIES

**Plaintiff:**

4.      Plaintiff Ndive Mongo Lambert, is an individual, a black, African American man, from

Cameroon, a citizen of the United States, and a resident of Prince Georges County, at 3003

Castle Garden Way, Olney, MD 20832.  Plaintiff was an employee of the Defendant SSC.

5.      Plaintiff, is a complainant and a person under 42 U.S.C. § 2000e, a person under 42

U.S.C § 1981, and an employee under Maryland Human Relations Code Title §§ 20- 601- 20-60.

Defendant has over five hundred (500) employees.

**Defendant:**

6.      Defendants are privately held limited liability companies that operate about 190 skilled

nursing and assisted living facilities in nearly 20 states, in the United States. Defendants are

headquartered at One Ravinia Drive, Suite 1500, Atlanta, GA 30346. Defendants are Delaware

LLCs doing business in Prince Georges County, Maryland, at 14200 Laurel Park Drive, Laurel, MD 20707. Defendants were Mr. Lambert's employer.

7.    Defendants are nongovernmental entities under 42 U.S.C § 1981, and employers under 42 U.S.C. § 2000e, and under Maryland Human Relations Code Title § 20-601.

## FACTS

8.    Plaintiff Ndive Lambert, is a black African American male, of Cameroonian origin.

9.    Mr. Lambert was discriminated against by SSC and its management, on the basis of his race, color, sex/gender, and national origin. He was retaliated against, harassed and treated in an unwelcome and unlawful manner that created a hostile work environment that impeded his ability to do his work.

10.    Mr. Lambert was unlawfully terminated under 42 U.S.C. § 2000e et seq., 42 U.S.C § 1981, FMLA, and Maryland Human Relations Code Title §§ 20-601- 20-60.

11.    Mr. Lambert has been a Registered Nurse in the State of Maryland since 2008.

12.    Mr. Lambert was hired by Defendant, on May 15, 2015 to the position of Director of Nursing at SavaSeniorCare Laurel Facility (Patuxent River Health and Rehabilitation Center ("PRHRC"), and he served in that position until he was wrongfully terminated on February 13, 2019, with no reason given to him at the time, for his termination.

13.    During Mr. Lambert's almost four (4) years tenure at SSC, and under his leadership as the Director of Nursing ("DON"), and that of his boss, the Administrator, Ms. Elizabeth (aka Beth) Neel ("Ms. Neel"), PRHRC improved its quality measures, decreased falls, improved the Center for Medicare and Medicaid services CMS Nursing home star rating, provided great care for the residents, managed overtime to below budget, cut creep time, got good annual health survey results.

14.    Specifically, when Mr. Lambert started work at PRHRC, in May 2015, the total numbers of falls/accidents was 23. For the month of June 2015, it fell to 8 – just one month into his tenure. In 2018, the total number of falls/accidents, under his leadership, for the month of August was 9 and 11 for September.

15.    When Mr. Lambert took over in May 2015, the total number of residents who were re-hospitalized within 30 days of admission at PRHRC, in May 2015, was fifteen (15). By September 2018, under Mr. Lambert's leadership, that number fell to six (6).

16.    One year after Mr. Lambert as the DON, and his Administrator Ms. Neel, took over clinical management at PRHRC, Mr. Lambert and Ms. Neel, in a competition between eleven (11) SSC member facilities in Maryland, defeated ten of them, and won the first and only Blue Ribbon and CEO Roundtable awards, for their facility – PRHRC for the financial year 2016-2017. The company's Blue Ribbon Award alone, was $45,000 (forty-five thousand dollars) that was distributed among all PRHRC staff.

17.    During his tenure at PRHRC, and prior to the day he was terminated, Mr. Lambert had no conversation or discussion with anyone regarding his job performance. He was never disciplined in any way, and had no disciplinary record before his termination. Mr. Lambert was hardworking, loyal, dedicated and reliable. And he was the longest serving Director of Nursing (at his almost 4 years term, until his wrongful termination on February 13, 2019), not only on the roll at PRHRC, but within SSC's Maryland District North East Division. He did not leave as other DON's left after a year or so, of their hiring.

18.    In his first year at PRHRC, as the Director of Nursing, Mr. Lambert improved clinical outcomes by decreasing the number of falls, number of in- house acquired pressure Ulcer (wounds), decreased antipsychotic medications usage and decreased usage of long/short stay

pain medications. In doing so he and his nursing team, improved quality measures from a 3 star to a 5 star rating which resulted in PRHRC winning in ten (10) years, its first and only Blue Ribbon Performance Award (launched by SSC in 2006), in 2016-2017, for East Division-Maryland District with a monetary value of $45,000.00 on April 26 2017.

19.     The $45, 000 was shared equally among all PRHRC facility staff. SSC's CEO Mr. Tony Oglesby came to PRHRC to distribute the award to the staff. During his presentation Mr. Oglesby stated: "This program was launched about ten years ago to help develop solid business practices across company facilities, it's definitely quite an accomplishment to win one of the awards, and we have a lot of facilities vying for the awards each year."

20.     Mr. Lambert and his team beat ten (10) other SSC facilities in the East Division-Maryland District, to win the award. And that award was won barely a year of Mr. Lambert and his boss, Administrator Elizabeth Neely, came on board as PRHRC's Director of Nursing and Administrator, respectively.

**SavaSeniorCare™ Blue Ribbon Performance Award**

21.     Below is SSC's statement about what the Blue Ribbon Performance Award was created to do, how important it is to SSC, what it encourages, how the reviewers conduct their evaluations, how they score evaluations, how the winner is chosen, and the award that goes with winning it:

> "This reward program encourages client centers and team members to distinguish themselves in the areas of clinical care, respectful culture, a clean and safe environment, customer service, and efficient business practices. Sava launched the Blue Ribbon program in 2006. The employee rewards program was created to drive Best Practices across all affiliated facilities through peer competition. Blue Ribbon reviewers conduct their evaluations during an unannounced visit. They appraise the physical appearance of the building, interview employees and confirm that key programs are in place. Scores from the onsite review are combined with other data, including regulatory compliance and employee and customer satisfaction survey results. The award is not tied to the facility's

financial performance. Winning facilities receive a monetary reward that is shared equally by all regular employees. The award came from the highest overall scores in areas such as customer service, quality of care, environmental excellence and more."

22.    In his second year as Director of Nursing and under the leadership of Beth Neel the Administrator, Mr. Lambert and his team improved the Center for Medicare and Medicaid Services (CMS) overall star rating for PRHRC, from a 3 to a 4 star, and improved Registered Nurse ("RN") star rating from a 2 star to a 4 star. As a result, on April 27 2017, Mr. Lambert and his team won the company's prestigious CEO Roundtable Awards for year 2016-2017, for East Division- Maryland District that year, after competing with other ten (10) SSC facilities in the Maryland district.

23.    From October 4 – 6, 2017, Mr. Lambert and his boss Elizabeth Neely, went to the 2017 CEO Roundtable Retreat in Palm Beach Florida at The Eau Beach Resort & Spa. Over the course of the three days, all the winners were able to sit down with the CEO Mr. Tony Oglesby alone. During the meeting, Mr. Oglesby wanted to hear from each winner what they did to make their facility become the best.

24.    On October 5, 2017, Mr. Oglesby sat down with Lambert and Beth Neel to discuss what he (Mr. Oglesby), can do to make both of them stay at PRHRC because he has heard a lot of great things about them, how they have turned PRHRC around, so much that the facility was having such good survey results, good customer service and management of overtimes and budgets.

25.    As part of their discussion, Mr. Oglesby, Ms. Beth Neal, and Mr. Lambert, talked about the new things that Ms. Neel and Mr. Lambert would like to do if only Mr. Oglesby will approve it, such as opening a Ventilator Unit. Mr. Oglesby responded that "it has been brought up before, but there was some questions about the clinical leadership at the time, which was before you

6

(Lambert and Neel) joined the company, but now that you are the Director of Nursing and Beth

Neel as the Administrator, then l am going to approve the construction of the Vent Unit." Mr.

Oglesby continued that "there used to be one in the company but because of the bad

management, I made a decision to close it but if you and Beth are able to open the Vent Unit in

Patuxent and run it successfully, then Patuxent will become the model for the company." Mr.

Oglesby also stated: "l will direct Timothy Schindler the COO for the company to oversee the

project and the goal will be to have our first Vent Unit patient in the 2nd quarter of 2019. Mr.

Lambert was terminated in February 2019, and so, cannot tell whether the Vent Unit was or is

being built.

26.     On October 6, 2017, the last day of the Retreat, Mr. Oglesby handed Mr. Lambert an

envelope and told him not to open it until he arrives at the airport, and that he should use what is

in the envelop to cover his expenses at home, for the days that he was at the Retreat and also to

buy his family some gift. Upon opening the envelope at the airport as Mr. Oglesby had instructed

him, Mr. Lambert found twenty-five (25) $100 bill's ($2,500) in a thank you note.

**SavaSeniorCare- CEO Roundtables Awards**

27.     The Roundtable Award, is given only to Administrators and Directors of Nursing of a

facility, and to the best of the best in each District. Winners like Mr. Lambert and Ms. Neely,

received the following: Access to the company's CEO's cell phone number; quarterly calls with

the CEO; a three days Retreat; a personalized yellow name tag; a crystal eagle statue; a CEO

bag; a CEO polo shirt; a company paid weekly housekeeping for one year, at $100 per week; and

they became mentors for their district.

**Other areas of improvement Under Mr. Lambert's leadership as Director of Nursing**

28.     Mr. Lambert and his team, decreased the number/rate of 30 days resident re-hospitalization from 9% to 5%. When Lambert first got to PRHRC, it had a high re-hospitalization rate of more than 9%. Mr. Lambert and his team, reduced the numbers, by getting all the attending doctors in the facility, to educate the nurses on the different interventions that can be performed in the facility before sending a resident to the hospital, and by making sure that before any resident is transferred out to the hospital, the Medical Director Dr. Dava Mitul, and himself Lambert, must be called first, except in situations where the resident is in a full code, i.e., in Cardio Pulmonary Resuscitation State ("CPRS") and is unresponsive. Mr. Lambert and his team increased clinical capabilities such as performing in house blood transfusion and in house dialysis.

29.     Mr. Lambert helped Nurse Gloria Kabba, to gain certification as a wound nurse, by encouraging her studies, approving necessary time for her to study, and by teaching her from his clinical knowledge and experience, on how to stage a wound.

30.     Mr. Lambert successfully managed hours per patient day (HPPD) to 3.2 on budget, and decreased creep time (amount of time staff stayed beyond their scheduled time), from more than 40 hours per week to less than 15 hours per week on average.

31.     In 2017, Mr. Lambert received a pay raise of $2,500.00. Beginning from 2016, Mr. Lambert received annual bonus every year that he was the Director of Nursing at PRHRC, except for 2019, because he was terminated before the bonus for that year was paid. In 2016 he received an annual bonus of $10,000.00. In 2017 his annual bonus was $22, 950.00, and in 2018, he received an annual bonus of $12,750.00.

32.    Mr. Lambert was on pace to get his 2018 annual bonus in March of 2019 but because he

was fired on February 13, 2018, he effectively was prevented from getting the 2018-2019 bonus.

**September 2018, Meeting at Office of Health Care Quality Columbia Maryland**

33.    At the Family council (i.e., certain relatives of residents at the PRHRC), meeting

(arranged by the family council), held in September 2018, at the Office of Health Care Quality

("OHCQ") in Columbia Maryland, which was attended by the CEO of SSC Mr. Oglesby, Beth

Neel Licensed Nursing Home Administrator, the President of the Family Council, and two of its

members), the council members asked for a change in the leadership at PRHRC i.e., a change in

the positions of Administrator and the Director of Nursing – that is, removal of Elizabeth Neely

the Administrator at PRHRC (white Caucasian female), and Mr. Lambert, the Director of

Nursing at PRHRC (black, African American Male, of Cameroonian national origin).

34.    After that September 2018 meeting at Maryland OHCQ, and hearing the Family Council

members request for change of leadership at PRHRC, Mr. Oglesby made it clear during a phone

call to Administrator Beth Neel, Jeff Solan Vice President of Operations Northeast District, East

Division, and Stacey Hallissey Senior Vice President Of Clinical Operations for SSC, that

Lambert and Beth Neely, will not be terminated because, "they are one of the best team of

Director of Nursing and Administrator we have in the company."

35.    The CEO Mr. Oglesby also came to Mr. Lambert and his boss Elizabeth Neel's office,

and assured them, that "there will be no change in leadership at PRHRC, because of the great job

you (Ms. Neel and Mr. Lambert), are doing at the facility," and that he was "willing to fight the

family council's change of leadership request because given that you (Ms. Neel and Mr.

Lambert), are doing a great job, it is not necessary to change leadership."

**Birth of Lambert's Premature Triplets and His Being on FMLA Leave**

36.    After the September 2018 meeting, and on the birth of his premature triplets, at 34 weeks

of gestation, through an emergency caesarean section, on November 14, 2018, Mr. Lambert went

on FMLA leave. While on FMLA leave, on January 23, 2019, Mr. Lambert, by email, requested

for a transfer to another SSC facility in his district - Heritage Harbor facility, which had a vacant

position for a Director of Nursing (it is usual practice for employees of SSC to transfer from one

facility to another). However, his email was never acknowledged, and he never received any

response to his transfer request, and it was never granted. When he asked what happened to his

request, he also received no explanation. Instead, Mr. Lambert was fired on February 13, 2019,

just five days after he returned to work from FMLA leave, and while his request for Intermittent

FMLA leave request, to take care of his wife and his triplets, and two weeks extension was still

pending.

37.    On November 14, 2018, Mr. Lambert's wife gave birth to their triplets at 34 weeks of

gestation by an emergency caesarean section at John Hopkins Hospital in Baltimore, with birth

weights of 4.9lbs, 4.2lbs, and 4.0 lbs. All the babies were taken to the Neonatal Intensive Care

Unit where they stayed there until their discharge from the hospital on December 23, 2018.

38.    After giving birth to the triplets, his wife, as a result of the pregnancy, developed High

Blood Pressure, which did not abate after the birth of their triplets. As a result, his wife required

medications with monitoring for constant headaches, dizziness, fatigue, continuing vaginal

bleeding and care for her surgical wound. His wife required weekly physician's visits.

39.    On the same day that his wife gave birth to the triplets, November 14, 2018, Mr. Lambert

notified his boss, the Administrator Ms. Neel, and Katie Harnsberger ("Ms. Harnsberger")  the

Area Manager Human Resources that he will be needing Family Medical Leave, under the
Family Medical Leave Act, ("FMLA"), to care for his wife and newborn premature triplets.

40.     Mr. Lambert completed the forms his company provided him, stating that he will be
needing FMLA leave, from December 26, 2018 to January 16, 2019 and that he may need
intermittent FMLA leave, from January 17, to March 26, 2019.

41.     Mr. Lambert's FMLA leave application was approved, and a printout copy of an email
from Ms. Harnsberger to Ms. Neel, was given to Mr. Lambert by her boss Ms. Neel, that stated
"Got it Approved on my end" dated December 21, 2018 at 9:08 a m.

42.     On January 9, 2019, Mr. Lambert sent another email to Ms. Harnsberger and Ms. Neel,
stating that he will be extending his FMLA leave, due to his very sick new born – one of the
triplets, and their mother, and also that he will be sending a doctor's note to Ms. Harnsberger.
Ms. Harnsberger asked Mr. Lambert to have the doctor complete another FMLA form, which
was completed and emailed to Ms. Harnsberger on January 31, 2019.

43.     On January 31st 2019, Mr. Lambert emailed Katie Harnsberger and Beth Neel, stating
that he will also need another form upon his return back to work, for FMLA leave, at the end of
February for 2 weeks, to care for his triplets.

44.     Mr. Lambert returned back to work from FMLA leave, on February 8, 2019. He was on
FMLA leave after the birth of his triplets, from December 21, 2019 until February 8, 2019, when
he returned to work. He was also awaiting approval of his FMLA intermittent leave.

**February 11, 2019: After Lambert's return From FMLA and Interim DON Katherine
Gaines' Statements to Lambert after Leaving the Administrator Beth Neel's Office**

45.     On February 11, 2019 at 11:55 a.m., Mr. Lambert had a conversation with Katherine
Gaines ("Ms. Gaines"), the interim DON from 360 Staffing (who took Mr. Lambert's place
while he was on FMLA leave), Ms. Gaines told Mr. Lambert that she has just left the

administrator Beth's office and that she (Katherine Gaines) told Beth that it was good that she (Katherine Gaines) was living, because the family council members and upper management (Stacy Hallissey, VP Clinical Operations and Jedd, Rawlings, Regional VP of Operations) are "trying to screw me up." Ms. Gaines, also told Mr. Lambert that she knows for a fact that Stacy from cooperate does not like her, because, she told Stacy, that the facility - PRHRC was well run (i.e., by Mr. Lambert and Ms. Neel), and that "everything was in place."

46.    Ms. Gaines told Mr. Lambert, that she thinks that Stacy "wanted to hear that everything was a mess." Ms. Gaines also told Lambert that she does not know why Jedd kept asking her about things that took place at PRHRC before she was hired as the interim Director of Nursing - as cover for Mr. Lambert who was on FMLA leave. For example, Ms. Gaines said Jedd asked her about the annual survey audit folder, which she had nothing to do with, as an interim DON.

47.    Ms. Gaines told Mr. Lambert that she told Jedd to ask Lambert who was back at work, and would know better where the folder is because, "I have not actually paid attention to it." Ms. Gaines told Lambert that Jedd's response was: "l don't need to talk to him (Lambert) and if I wanted to, then I would have gone to him already." Then, Ms. Gaines added that "Stacey and Jedd's behaviors are strange."

**February 12, 2019: Lambert's Conversation with District Clinical Director Richie McAlevy**

48.    On February 12, 2019, at12:30 p.m., while Mr. Lambert was in his office with Richie McAlevy having some discussions, and reviewing the plan for a certain resident, Mr. Lambert asked Mr. McAlevy about the status of his request for transfer to Heritage Harbor facility. Richie's response was that he told Jedd Rawlings and Stacy Hallissey about Mr. Lambert's request for transfer to Heritage Harbor facility, but no one had said anything to him, but that they will handle it.

49.    Mr. McAlevy told Mr. Lambert that: "since I am leaving the company, I will just tell you that the families want both yours and Beth's head because, they don't like both of you." Also, "because it is costing the company more money with you (Lambert) being on FMLA leave and the company having to hire and pay an interim Director of Nursing."

50.    Richie McAlevy told Mr. Lambert that "Jedd and Stacy will look for an excuse to fire you but if you (Lambert) are on FMLA leave, then it will be difficult." He also stated that Jedd and Stacy do not talk to any of the district heads, they just do what they want. He also told Mr. Lambert that he told Stacy and Jedd that "Patuxent Health Rehabilitation Center is the best run facility in our district and that not all what the families are saying is true." For example, in their last meeting the families complained about PRHRC not having vital sign machine and the Hoyer's left are not working. But immediately after the meeting, he (Richie McAlevy) went and Checked, and everything was working fine.

51.    Richie McAlevy then asked Mr. Lambert what he wanted to do, because no matter what, Jedd and Stacy will fire him, because it is costing the company a lot of money by having two Director of Nursing. Mr. Lambert answered that he is not planning to leave, but they can do what they want.

52.    Richie McAlevy also asked Mr. Lambert if he knew that Tony Oglesby is no longer the CEO for the company. Mr. Lambert answered no, that he did not know, and asked why the former CEO Tony Oglesby left. Richie told Mr. Lambert that based on what they were told, "The Bank will not refinance with Tony as the CEO so he was pushed out of the company." Richie told Mr. Lambert that he would love to come back to the company only after they have made significant number of changes in management. He told Mr. Lambert that his last day is the end of the month (February 2018), and he was going to work with Christine his forma Boss.

**February 13, 2019: PRHRC Performance Improvement Project (PIP) Review Meeting Held at the Facility Conference Room**

53.    On February 13, 2019, at 10:30 a.m., Mr. Lambert the DON, Rita Vann, VP of Quality Improvement, Dr. Mary Palmquist Evans ("Dr. Evans"), Chief Medical Officer, Beth Neel, Administrator, and Katherine Gaines, Interim Director of Nursing, were present to review the facility's current PIP. A copy of all the facility's open PIP was handed to Rita, and went over one by one. After each PIP was reviewed by the group, Rita stated: "you did a great job and I will review them and I will bring them tomorrow."

54.    Looking at the communication PIP, Rita Vann stated that she sees that Lambert and his boss Beth Neely, have done in-service on communication which is very good, and wanted to know the feedback from the families. Mr. Lambert told Rita Vann that 90% of the families like it, because they have seen that they were getting increased numbers of calls, and also that they knew that the staff were doing shift to shift walking rounds.

55.    At that point, Dr. Evans asked: "then why is it that some of the families are still saying that they don't get calls?" Mr. Lambert explained that there are three (3) particular family members who will say one thing to a staff member, and go to another staff member and say another thing that no one has ever talked to them.

56.    Mr. Lambert also explained that "we are using our ambassador rounds which is being done mostly by nursing staff because some members of different departments will not do it such as HGS staff, Rehab Manager and MDS departments because their bosses said not to do it." Rita said that is not correct and she was going to take that back to Atlanta – SSC's headquarters.

57.    Mr. Lambert also explained that: "the family members have my work cell phone number which they have been using to call me at all times." Rita then stated: "it is great that you have

that relationship with the families." Rita also stated: "you guys have a better knowledge about the PIP process than 90% of the facilities in the company."

58.     Dr. Evans then said to Mr. Lambert: "I am sure that you are aware of my reviews that I did about a month or two ago and found out that they were residents that didn't get a shower or bed bath for months and she wanted to know what is your plan on that."

59.     Mr. Lambert told Dr. Evans that it was the very first time that he was hearing of such reviews or the alleged complaints from the residents, since he just returned to work on 2/8/2019 after about seven weeks absence on FMLA leave (from 12/21/18 – 2/8/19), and also that he disagreed with Dr. Evans on what she said because they have documentations on Point Click Care regarding showers, and the last times that residents saw the podiatrist. Mr. Lambert also told Dr. Evans, that PRHRC have records including shower sheet to show that residents got shower on their shower days.

60.     Mr. Lambert's boss, administrator Ms. Neel, also told Dr. Evans that it was the first time she was hearing about Dr. Evans' alleged reviews that she claimed she did, about a month or two ago, and her claim that there were residents' who did not get a shower or bed bath for months, even though she (Beth Neel) herself, have been around and Dr. Evans never mentioned anything of the sort that she was presenting at the meeting to her.

61.     Dr. Evans then said: "why did Michelle the unit manager not show me when I asked on that day?" Mr. Lambert responded and told Dr. Evans that: "we don't have any staff or unit manager with that name here, at PRHRC," which is a fact. Dr. Evans stated that she spoke to Michelle on that day, but there is no one named Michelle at that time at the PRHRC facility where Mr. Lambert worked. Dr. Evans, seeming embarrassed, said to Mr. Lambert, "I would like to see the records for the showers now, I want you to show me the records immediately."

62.     At that 2/13/2019 PIP meeting, it was apparent to all present that Dr. Evans did not

contribute in any way positive, to improve the facility's performance, which was the purpose for

the PIP meeting. Instead, all that Dr. Evans did, was, make false and unfounded accusations

against PRHRC facility in a way that was intended to reflect negatively on Mr. Lambert and his

boss administrator Elizabeth Neely's leadership, and by intentionally and unfairly making

accusations that seemed to be pandering to, and irresponsibly stoking resentment from the family

members, against Lambert, and his boss administrator Beth Neel when they hear Dr. Evans's

unfounded thin veiled accusations, posed as legitimate questions at the PIP meeting.

63.     Dr. Evans stated that she did skin checks on residents and found out that they were

residents who have their nails very long until it has grown into their skin and have not being seen

by a podiatrist or cut for months.

64.     Mr. Lambert told Dr. Evans that her information was not true because he himself, his

Assistant Director of Nursing ("ADON"), and unit manager did a complete skin sweep in

September 2018, before PRHRC facility's annual survey and no resident had any issues with toe

nails. Also that the facility's podiatrist have been seeing the residents regularly, monthly, since.

65.     Dr. Evans then asked Mr. Lambert: "Do you have a podiatrist notes or logs that you are

talking about because I know for fact no one has seen the residents for months."

66.     Rita Vann then said to Mr. Lambert: "if you have the records then you should go bring it

for her (Dr. Evans) to see it." Dr. Evans then said that she wanted to see the podiatrist logs or

notes that show they were seen by podiatrists and also all the shower sheets because she doesn't

believe that Lambert and his team, gave showers to those residents.

67.     Mr. Lambert went and brought the recording books. After reviewing the records, Dr.

Evans asked Mr. Lambert: "How do you know that shower was given?" Mr. Lambert responded

and explained that whenever shower is given to a resident, the Nurses sign it in the electronic Treatment Administration Record (TAR).

68.     Dr. Evans asked Mr. Lambert: "how would you know that the shower was in fact given?" Mr. Lambert responded and explained that they (he, his administrator and the unit managers (aka facility nurses), discussed about who's getting or has gotten shower, daily during clinical stand up and clinical stand down meetings. And that they also discussed it weekly on At Risk meetings.

**After The PRHRC Performance Improvement Project (PIP) Review Meeting**

69.     Dr. Evans was very defensive and aggressive to point out that no showers were given and residents had long toes nails. The PIP meeting ended sometime after 2:00 p.m., and attendees dispersed. At 2: 15 p.m., Dr. Evans chased Mr. Lambert all the way into the Administrator Elizabeth Neel's office, where Mr. Lambert was sitting talking to his boss, Ms. Neel.

70.     When Dr. Evans saw Mr. Lambert in her boss' office, she demanded that Mr. Lambert, come out of that office. When Mr. Lambert came out, Dr. Evans, in an angry and loud voice, accused Mr. Lambert of lying about the shower records, and stood in Mr. Lambert's face and personal space, which caused Mr. Lambert to take three (3) steps backward away from Dr. Evans.

71.     Again, and 30 minutes later at 2: 45 p.m., Dr. Evans chased Mr. Lambert again into his office. Standing over Mr. Lambert across from his desk, Dr. Evans shouting at Mr. Lambert, in a loud and aggressive voice, told Mr. Lambert: "I need copies of the documents now!" Dr. Evans asked Mr. Lambert to make copies of only the podiatry list for January and February for her (Mr. Lambert was on FMLA leave from December 21, 2018 until February 8, 2019), while she asked the interim DON Katherine Gaines, to make copies of the podiatry book and wound log.

72.    Dr. Evans clearly targeted Mr. Lambert. Although he was the Director of Nursing, he was

not the only person responsible for the overall running of the PRHRC facility. Ms. Elizabeth

Neely is the Administrator and Mr. Labert's boss, with the overall responsibility for the running

of the PRHRC facility. Mr. Lambert is a black man from Cameroon. The administrator Elizabeth

Neely, is a white Caucasian American woman, but Dr. Evans never directed any of her questions

at the meeting directly at Ms. Neely, never faulted her, or tried to impugn on her character or her

professional ability and reputation as she (Dr. Evans) did to Mr. Lambert's, by falsely accusing

him of lying even though she knew that was not true.

73.    Before Mr. Lambert went on FMLA leave, Dr. Evans never brought any of the issues she

was now intentionally, aggressively, and wrongfully, accusing and harassing Mr. Lambert about,

to the attention of the Administrator Elizabeth Neely, or Director of Nursing Mr. Lambert's

attention prior to his FMLA leave, or prior to the February 13, 2019 PIP meeting.

74.    The PIP meeting, was the first time that Dr. Evans ever raised those issues with both Mr.

Lambert and her boss administrator Elizabeth Neel. While Mr. Lambert was on FMLA leave

after the birth of his premature triplets for about seven weeks, administrator Beth Neel was still

working at PRHRC facility, and Dr. Evans could have raised those issues with her, if Dr. Evans

honestly believed such issues as she was raising and questioning Lambert about at the PIP

meeting, actually existed.

75.    Before the PIP meeting, Dr. Evans never spoke to the people in charge of PRHRC

facility, i.e. Mr. Lambert and Ms. Neel, about any of the issues she was now talking about, but

chose to discuss them (even though there was no factual evidence of what she was talking

about). Dr. Evans raised the issues for the first time, at a meeting, even though the purpose for

the meeting was to review improvements that had already been made, and suggest further

improvements that was necessary. Dr. Evans was not interested in reviewing the good work Lambert and his boss have done, but to find something against Mr. Lambert.

76.    For no reason, Dr. Evans harassed and treated Mr. Lambert in an unwarranted and unacceptable hostile manner. Dr. Evans targeted Mr. Lambert and intentionally treated him in a reckless manner without any regard to his rights. Dr. Evans chased Mr. Lambert from office to office, yelled at him, and demanded that he come out of the office of his boss, while he was having discussion with his boss Elizabeth Neely. Dr. Evans aggressively, and in an angry and loud voice, wrongly accused Mr. Lambert of lying about the shower records.

77.    Dr. Evans' actions in standing in Mr. Lambert's face and personal space, which caused Mr. Lambert to take three (3) steps backward away from Dr. Evans, was openly aggressive, and hostile, and Mr. Lambert found it highly offensive, and intolerable.

78.    Due to the discriminatory, harassing and hostile way Dr. Evans' treated Mr. Lambert, and the fact that it was highly offensive and unacceptable to him, because it also impacted his ability to do his work, just few days after his return to work, from seven weeks FMLA leave, at 2: 55 p.m., Mr. Lambert reported Dr. Evans to Rita Vann, the Vice President of Quality Improvement, and his boss, Elizabeth Neely, the Administrator, and complained about Dr. Evans's unacceptable, hostile and discriminatory behaviors and treatment of him. Mr. Lambert told both Rita Van, and Ms. Neely, that Dr. Evans' actions was racially discriminatory against him, and amounted to harassment/hostility, because Dr. Evans singled him out and made him the fall guy at the PIP meeting and thereafter, even though he did nothing wrong, and he was not the overall head, or only person in charge of running the PRHRC facility, since the facility was run by both his boss, Ms. Neely the Administrator, and himself, the Director of Nursing.

**February 12, 2019: Interim DON Katherine Gaines' Statement Regarding the Podiatrist**

79.     On February 12, 2019 at 3: 35 p.m., the interim DON Katherine Gaines came into Mr.

Lambert's office, and in the presence of Ms. Fatima Conteh the Assistant Director of Nursing

("ADON"), and Ms. Gloria Kabba, the Wound Nurse, told Mr. Lambert that Rita Vann and Dr.

Evans had asked her to call the podiatrist to come tomorrow morning and do a complete sweep

of the facility for toe nails. Mr. Lambert went and got his boss, the Administrator Elizabeth Neel,

to hear what Katherine Gaines, was telling him. Then, in the presence of Mr. Lambert, and all

named above, including the interim DON Katherine Gaines, Administrator Ms. Elizabeth Neel,

called Ms. Vann on her cell phone but she did not pick up, so Ms. Neel left Ms. Rita Van a

message on her cell phone.

80.     About 10 minutes later, Rita Vann returned the call back and Mr. Lambert picked up the

phone during which Rita Vann stated that yes, she and Dr. Evans asked the interim DON

Katherine Gaines to call the podiatrist to come tomorrow morning to do a sweep on resident's

toes and nails but that she knows that due to insurance, the podiatrist may not do it, but the that

the nursing staff can do it.

81.     Dr. Evans and Rita Vann clearly tried to undermine Mr. Lambert and his boss the

administrator Elizabeth Neel, by going behind their backs to try and engage the podiatrist,

themselves, even after Mr. Lambert had already provided Dr. Evans with the records and

documented entries on electronic medical record documentation system in (Point Click Care).

The entries showed showers given, and the last times that residents saw the podiatrist. Mr.

Lambert and his nurses could do a sweep themselves and in fact, did one in September 2018. Mr.

Lambert had his last annual health survey inspection on 9/19/2018, and thereafter, the podiatrist

visited and checked the residents in October, November, December, 2018, and January 2020

(these were electronically recorded and Dr. Evans can access them). So, there was no way residents would have long or ingrown nails, and there was no need for a sweep in February.

**February 13, 2019: Interim DON Katherine Gaines' Statements to Mr. Lambert Regarding what Dr. Evans Said About Mr. Lambert in His Absence**

82.     On February 13, 2019, at 3: 25 p.m., in Mr. Lambert's office, after stand down meeting, Katherine Gaines, told Mr. Lambert that while Mr. Lambert went to fetch the shower folder that Dr. Evans had requested to see, Dr. Evans said that Mr. Lambert was lying to them in their face. Mr. Lambert fetched and provided Dr. Evans both the folder for the shower sheets, and the podiatry books and went to fetch the audit folder. Katherine Gaines repeated the same information to the Administrator who then asked: "What did you say?" Katherine answered that she did not say a word.

83.     Ms. Gaines told Mr. Lambert that Dr. Evans made her (Ms. Gaines) "come up with things and type it for them last night (2/12/2019) that she (Ms. Gaines) did not know what they want to do with it."  Ms. Katherine Gaines, also said to Mr. Lambert, "Dr. Evans uses her power and position to make sure you are fired today."

84.     Mr. Lambert faced aggressive racial hostility and racial harassment from Dr. Mary Evans, during the PIP meeting and thereafter. On February 13, 2019, after targeting and singling out Mr. Lambert, during the PIP meeting with other management officials earlier in the day, Dr. Evans chased Mr. Lambert all the way into the Administrator's Office where Mr. Lambert was talking to his boss Beth Neely, and yelled at him in a loud, aggressive voice and tone, to come out of the office. Raising her voice angrily, and speaking loudly, Dr. Evans accused Mr. Lambert of lying about shower sheets and the podiatrist log, which is not true. Dr. Evans, did this standing up close in Mr. Lambert's face and personal space, which caused Mr. Lambert to take 3 steps backward, away from Dr. Evans's intimidating, aggressive, and hostile behavior towards him.

85      Thirty (30) minutes later, Dr. Evans chased Mr. Lambert again into his office, and standing over Mr. Lambert across from his desk, yelled at him, "I need copies of the documents now!"

86.     Mr. Lambert accused Dr. Evans of racial discrimination, hostility and harassment, and reported Dr. Evans and her actions against him, to Rita Vann, VP of Quality Improvement and his boss, the Administrator Beth Neel, claiming racial discrimination, hostility and harassment.

87.     Later that same day – 12/13/2019, Mr. Lambert was fired. Just five (5) days after returning from FMLA leave, that he took to take care of his family, because of the caesarian birth of his premature triplets, and who at that time, still needed medical attention.

88.     Dr. Evans repeated the same lies to Katherine Gaines that Mr. Lambert was lying, about shower sheets and the podiatrist log office, even though Dr. Evans had nothing to show that Mr. Lambert was lying.

89.     After accusing Dr. Evans of racial discrimination, hostility and harassment, and after reporting Dr. Evans to the VP of Quality Improvement Rita Vann, and his boss, the Administrator Beth Neel, claiming racial discrimination, hostility and harassment, later on the same day, Mr. Lambert was terminated. Mr. Lambert believes that his reporting Dr. Evans behavior, contributed to him being fired, and that amounts to retaliation.

**February 13, 2019: Separation Conference Conversation at the Administrator Elizabeth Neel's Office**

90.     On February 13, 2019, at 4:43 p.m., in the Administrator Beth Neel's office, the Clinical Director for the East District Jann Robinson, told Beth Neel and Mr. Lambert, that "the reason I am here is because we are having separation from the company meeting with Lambert. Then, Administrator Beth Neel asked Jann Robinson: "what is your reason for letting Lambert go?"

Jann Robinson answered by directing that the administrator Beth Neel should give Beth Murray of Human Resources a call to discuss her concerns if that is the case.

91.    Administrator Beth Neel told Jann Robinson that Dr. Evans claimed to have found long toes nails and residents that did not get shower but Dr. Evans never talk to any nursing staff to asked for the shower sheet or when was the last time that the resident saw podiatrist and Dr. Evans findings have never being shared with her, even though she had asked Jedd and Stacy about it. Jann Robinson made no comment on what Beth just said, instead she said: "here is a separation package from the company which Lambert does not have to sign today and can take it home and read."

92.    Ms. Jann Robinson told Lambert and Elizabeth Neel, that she was not aware of the reason the company was letting Lambert go but if Lambert have any questions then he too should contact Beth Murray HR, because she thinks that Beth Murray knows more.

93.    After Mr. Lambert was terminated on February 13, 2019, he lost his health insurance coverage for himself and his family. Due to that loss of coverage, Mr. Lambert was unable to take of his, and his family's medical needs, especially his wife, and his new born premature triplets.

94.    The Last day of medical follow up for Mr. Lambert's newborn premature triplets was January 25 2019. From February 13, 2019 (the day he was terminated), to April 10, 2019, Mr. Lambert had no insurance coverage for himself, his wife Adelley Meteh, his oldest child, 10 years old son Oscar, and his premature newborn triplets Lambert Jr., Hannah-Kristina, and Lucy.

95.    Mr. Lambert laments: "Those were the most painful days of my life, watching my wife suffer serious medical issues without treatment, and helplessly watch my premature newborn triplets who were very sick and require constant medical attention and follow ups, labor to

survive without medical care, because their dad was terminated, and so, lost his job's medical health insurance coverage, and as an extension, their medical health insurance coverage, just because he is a black man from Cameroon."

96.     On February 20, 2018, my wife was unable to go for her follow up medical appointment for her elevated blood pressure, pain on the surgical site and virginal bleeding

97.     On February 26, 2019, Mr. Mr. Lambert was unable to take one of the triplets, Lucy, for her two months medical appointment with her Pediatrician after been discharged from the Neonatal Intensive Care Unit from Howard County Hospital.

98.     On March 2, 2019, another of Mr. Lambert's premature triplets, his daughter Hannah-Kristina became sick with cold and was having difficulty breathing, but Mr. Lambert was unable to take her to the Doctor's office due to no insurance and the preemie's doctor will not see her until Mr. Lambert provides insurance coverage.

99.     On March 6, 2019 Hannah- Kristina was taken to the ER for worsening cold and difficulty breathing because she did not get early treatment as her pediatrician would not see her, because Mr. Lambert did not have health insurance coverage for her daughter, due to loss of his job.

100.    On March 13, 2019, Mr. Lambert was unable to take his premature born triplets to their doctor for their four (4) months follow up medical appointment because he had no health insurance to cover them, because he lost his health insurance when SSC terminated him on February 13, 2019, five days after he returned from FMLA leave, he took to take care of his wife and premature triplets.

101.    On March 28, 2019, Mr. Lambert's wife was unable to go for her medical follow up appointment because Mr. Lambert had no health insurance to cover her, because he lost his

health insurance when SSC terminated him on February 13, 2019 five days after he returned from FMLA leave, he took to take care of his wife and premature triplets.

102.    On March 5, 2019 Mr. Lambert completed an application for Medicaid health insurance coverage at Maryland Department of Health website but did not get the health insurance number until April 10, 2019, which was when he was able to make medical appointments for his newborn premature triplets. The pediatrician will only see the newborn premature triplets when Mr. Lambert had the insurance number and information.

103.    When SSC and its management Terminated Mr. Lambert, and thus, terminated his medical health insurance, they knew that his wife had just delivered by emergency caesarian section, three premature babies. They knew that his wife and the triplets, still needed medical health. They knew that his wife and his premature triplets, were dependent on, his job's medical health insurance from SSC, as they were covered under it. SSC and its management also knew that Mr. Lambert's termination would mean that he would also lose his medical insurance, and as such, his wife and his children will also lose coverage, and they knew the impact and potential danger they were putting the lives of Mr. Lambert's wife and his children at a very delicate time of their lives when their need for medical care and treatment, was crucial.

104.    Losing his job, and with it, his medical health insurance for himself, and especially for his family, and having premature triplets who were not quite "out of the woods," and a wife who was still having significant medical issues due to the caesarean birth of premature triplets including high blood pressure and continued bleeding, with no health insurance to cover them, was devastating and overwhelming for Mr. Lambert. It drove him into deep anxiety. Mr. Lambert was highly humiliated stressed and anguished, and a result, Mr. Lambert became terribly anxious and highly depressed. His blood pressure, went so high that he needed

medication. He went into depression, and thought of killing himself because he could not provide for his family.

105.    On March 26th 2019 Mr. Lambert was put on medications. He was prescribed antidepressant Celexa 10mgs once a day for Anxiety, and Hydrochlorothiazide-losartan 12.5mg-50mg once daily for High Blood Pressure. Prior to his termination, he never suffered from anxiety and depression and never took medication for them or for high blood pressure. Before his termination, his blood pressure was at 132/68, and as a result of the stress, humiliation anxiety and depression, he suffered after his termination, his blood pressure rose to 168/110 causing his doctor to put him on medication, to control it.

106.    Mr. Lambert started looking for jobs including going for job training programs, but was unsuccessful in getting a job. He was living on unemployment and food stamps which is something he had never done before.

107.    Unable to get a job, Mr. Lambert started driving Uber full time while still looking for a job as a nurse. He completed many applications but was never hired.

108.    On April 10, 2020, Mr. Lambert was able to get a job as an interim Director of Nursing for Genesis Healthcare at Catonsville Commons in Baltimore where he worked until June 26th 2020, when the in-house person who was on orientation for the post, took over. After that, Mr. Lambert was transferred to Genesis healthcare Larkin Chase as interim Unit Manager, to cover for the manager, who was on FMLA leave.

109.    On July 7, 2020, Mr. Lambert was offered the position of Director of Nursing for Genesis healthcare Larkin Chase because of the great job he did as both interim Director of Nursing at Genesis Catonsville Commons, and as interim Unit Manager at Genesis Larkin Chase and he accepted the job, where he is currently employed.

110.    Because of the discriminatory discharge, Mr. Lambert suffered emotional distress, anxiety, depression, high blood pressure, humiliation, anger, and lack of self-worth that almost led him to take his own life. As a result of his termination, Mr. Lambert also suffered great financial difficulties: he was unable to pay his monthly mortgage, other bills, car insurance payments, and was unable to do necessary mechanical repairs on his car.

111.    On the other hand, the administrator, Beth Neel (a white Caucasian female), and Mr. Lambert's boss, who is the other person the Family council wanted changed, as was Mr. Lambert, was treated differently and better than Mr. Lambert (a black, African American Male, of Cameroonian national origin). First, Ms. Neel, was asked by SSC, to transfer to another SSC facility - Arcola Health Center, or Heritage Harbor Health and Rehabilitation Center as an Administrator, and with the same pay rate. She was not fired as Mr. Lambert was, because of her color, race, gender, and national origin. She did not transfer, but later resigned on her own accord, and went to work for another company.

112.    Also, other SSC Directors of Nursing who are white Caucasian American females were allowed to transfer to other SSC facilities, while Mr. Lambert was not allowed to do so. For example, Vernan Russell, transferred from Overlea Health and Rehabilitation Center to Glen Burnie Health and Rehabilitation Center. When it did not work out for her at Glen Burnie, she transferred back to Overlea. Debby Abbey transferred from Forest Hill Nursing Center to Overlea Nursing Center, and then to Bel Air Health and Rehabilitation Center. And Laura Waterman was also allowed to transfer from North Arundel Health and Rehabilitation Center to Heritage Harbor Health and Rehabilitation Center where she was the acting DON for a period of time.

113.    DONs with poor performance, poorly run facilities and poor star rating in quality measures, facility overall rating and health inspection who are white or American by birth or have different nation of origin who were never terminated because of their performance are as follows, but Mr. Lambert who performed better than them, was terminated, for example, (1) Carmen G Morgan (white American) DON at Summer Park (2) Abbey Deborah (white American) DON at Bel Air Health and Rehab (3) Vernan Russell (white American) DON at Overlea Health and Rehab, and (4) Carol Brown( white American) DON at North Arundel health and Rehab

114.    Mr. Lambert believes that SSC treated him differently by not granting his transfer request as it did other female white Caucasian counterparts, who were directors of nursing, as he was, and that SSC discriminated against him based on his race, color, gender/sex and national origin.

115.    SSC retaliated against Mr. Lambert by terminating him the same day, after he engaged in protected activity, by accusing Dr. Evans of racial discrimination, harassment and hostile treatment, and reporting that to Rita Vann, SSC's VP of Quality Improvement and his boss Elizabeth Neely.

116.    Dr. Evans intentionally and recklessly targeted Mr. Lambert, because of his race, national origin, color, and sex, at the PIP review meeting and thereafter. Dr. Evans harassed, intimidated, humiliated, and created a hostile work environment for Mr. Lambert to work in. Dr. Evans was intent on getting Mr. Lambert terminated, and their actions led to Mr. Lambert accusing her of racial discrimination, harassment and hostility, and as a result, he was terminated.

117.    Rita Vann, and Jedd Rawlings, also arbitrarily, irresponsibly, and intentionally planned to wrongfully, discriminatorily, and unconscionably terminate Mr. Lambert, and as a result, his medical insurance, because it will be expensive for the company to cover him with an interim

director of nursing, while he continues his further requested FMLA leave, and the intermittent

FMLA leave that he had informed them he will be needing.

118.    At the PIP meeting, Dr. Evans claimed that she was informed by a fictitious Michelle at

PRHRC facility (there is no person with that name at PRHRC), about what happened to be non-

existent issues that Dr. Evans raised at the PIP meeting. Dr. Evans was not happy and became

defensive, when Mr. Lambert told the whole meeting that there was no such person named

Michelle at PRHRC, and that raised Dr. Evans' ire against Mr. Lambert, that led her to retaliate

almost immediately by harassing, intimidating him and humiliatingly and wrongly accusing him

of lying.

119.    Dr. Evans chased Mr. Lambert into his boss office, yelled at him in a hostile, loud, and

intimidating tone and voice, to come out from there, while he was speaking to his boss Beth

Neely, and she chased Mr. Lambert into his own office, stood over his desk in an aggressive,

intimidating, and confrontational manner accused Mr. Lambert of lying, even though she knew

Mr. Lambert was not lying, because he had already provided Dr. Evans with the electronic

documentary record/evidence where Dr. Evans can see for herself what Mr. Lambert told her.

120.    Dr. Evans' harassment and hostility against Mr. Lambert after he stood up to her and

challenged her during the PIP review meeting led to Dr. Evans retaliating against him by

harassing and creating a hostile work environment for him, which he found uncomfortable and

unacceptable, that led him to report Dr. Evans to the Vice President of SSC, and her boss, which

led to her termination. Dr. Evans's actions, were wrongful, intentional, discriminatory, and

unacceptable to Mr. Lambert.

**Count One Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
Disparate Terms and Conditions of Employment Based on Race,
National Origin, Color and Sex/Gender**

121.    Plaintiff hereby incorporates by reference the preceding paragraphs.

122.    Defendant engaged in unlawful employment practices in violation of Title VII, 42
U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting him to discriminatory treatments, and by
ultimately terminating him based on his Race, National Origin, Color and Sex/Gender.

123.    Defendant is an employer as defined under 42 U.S. Code § 2000e (b).

124.    Plaintiff is Black/African American and, thus, a member of a protected class.

125.    Plaintiff was terminated from his job and, thus, suffered an adverse employment action.

126.    At the time of the adverse employment action, Plaintiff was performing his job duties
satisfactorily.

127.    Plaintiff was treated differently than non-African American/Black employees outside of
the protected class.

128.    Mr. Lambert is an African American man, and SSC and its management were aware of
this, and his race was a motivating factor in Defendant's unfair treatment and decision to
terminate him.

129.    Defendant engaged in unlawful employment practices in violation of Title VII, 42
U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting him to discriminatory treatments, denying him
his rights under the FMLA, by ultimately terminating him based on his on Race, National Origin,
Color and Sex/Gender.

130.    Defendants' decision to discharge Plaintiff has been to deprive Mr. Lambert of equal
terms, benefits, and conditions of employment opportunities that his white, Caucasian women
Director of Nursing counterparts who worked for SSC, received.

131.    Plaintiff's counterpart Directors of Nursing, including his boss Elizabeth Neely, who are white Caucasian Americans, were treated more favorably and were not subjected to the same adverse treatments as he was. Mr. Lambert was terminated and his request to be transferred to another SSC facility was denied while other similarly situated, were allowed or given transfer options by SSC, and none was terminated.

132.    Because of SSC's actions, Mr. Lambert suffered humiliation, financial injury, emotional distress, depression and anxiety, and developed high blood pressure, and suicidal ideation, as a result of the discriminatory way Defendant and its agents treated him, his termination and the attendant loss of his medical health insurance, at a time he and his family needed it most, Defendant and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, on the basis of his race, in violation of 42 U.S. Code § 2000e et seq.

133.    The unlawful employment practices complained here in were intentional.

134.    The unlawful employment practices complained here in were done against Mr. Lambert with malice or with reckless indifference to the federally protected rights of Mr. Lambert.

135.    Defendants' unlawful and discriminatory actions against Plaintiff, are based on his race, in violation of Title VII. They were intentional, willful, malicious, and was intended to injure Plaintiff, and was done with conscious disregard for Plaintiff's civil rights, entitling Plaintiff to an award of back pay, front pay, lost time from employment, compensatory damages, and punitive damages.

### Count Two Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
### Harassment Hostile Work Environment Based on Race
### National Origin, Color and Sex/Gender

136.    Plaintiff hereby incorporates by reference the preceding paragraphs.

137.    Defendant engaged in unlawful employment practices in violation of Title VII, 42

U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting him to harassment and a hostile work

environment and by ultimately terminating him based on his Race, National Origin, Color and

Sex/Gender.

138. Defendant harassed and subjected Plaintiff to disparate working conditions and a hostile

work environment of Mr. Lambert, and through its Caucasian employee Dr. Evans's conducts

that let him to report her, and that ultimately caused his termination, including, inter alia:

> a. targeting, and singling out Mr. Lambert, at a meeting, and making assertions that she knew were untrue just to humiliate, intimidate and impugn on his professional abilities, and his character.
> b. publicly yelling at and disrespecting Plaintiff;
> c. standing too closely in Plaintiff's personal space, and aggressively and loudly calling him a liar, when Dr. Evans knew that was not the case.
> d. telling the interim DON Katherine Gaines that Mr. Lambert was lying when Dr. Evans knew that to be false.
> e. intimidatingly, disrespectfully, and confrontationally demanding that Plaintiff come out of his boss's office immediately while Plaintiff was discussing with his boss.
> f. publically standing in an aggressive, intimidating, and threatening manner in his face and space, that caused him to take 3 steps backwards from Dr. Evans;
> h. standing in an intimidating, aggressive, threatening, and confrontational manner in front of Plaintiff in his office, over his desk, and disrespectfully in angry and loud voice, yelling and demanding that he produce the shower and podiatry records.
> i. implicitly attacking Plaintiff's leadership and job performance;
> j. overt and covert encouragement to the Family Council unfounded attack on Plaintiff's leadership'
> k. undermining his leadership by questioning him about matters that Dr. Evans herself said took place while Plaintiff was on seven weeks FMLA leave;
> l. undermining Plaintiff and his Boss, Ms. Neely, by calling the podiatrist to do a sweep on residents toe nails – a job Plaintiff's nurses can do, had already done, and making another sweep unnecessary;
> m. undermining his leadership and management competencies by inquiring if subordinates felt safe under his leadership;

n. retaliating against Plaintiff, with termination, after he complained to the VP, and Administrator, that Dr. Evans, has racially discriminated, harassed, and treated him in a hostile manner;

o. failing to raise any concerns she may have, prior to Plaintiff's FMLA leave, or with his boss Administrator Elizabeth Neely, before making unfounded accusations at the PIP meeting;

p. failure to investigate thoroughly any issues she may have heard from the residents or their families, before commenting about them in a PIP review meeting, and before falsely accusing Plaintiff;

q. terminating Mr. Lambert on February 13, 2018; and

139.    All of the foregoing conducts were based on Plaintiff's race, national origin, color and sex/gender. And Mr. Lambert perceived the hostile work environment Dr. Evans created by her false allegations, harassment and hostility to be racially abusive and unlawful.

140.    Dr. Evans's harassment and hostility against Mr. Lambert, was offensive, unwelcome, unacceptable to Mr. Lambert.

141.    Dr. Evans's harassment and hostility against Mr. Lambert, were severe, pervasive, and altered the conditions of his employment, because they created an abusive and hostile work environment, for him and ultimately resulted in him being fired after he complained about them.

142.    Dr. Evans's harassment, hostility, and false allegations against Plaintiff unreasonably interfered with Plaintiff's work performance, when he could not peacefully discuss with his boss in her office, or concentrate with his work in his own office, without hostile interruption by Dr. Evans, and when he was made by Dr. Evans, to waste precious time, fetching reports, and answering to unfounded issues deliberately concocted to undermine him, by Dr. Evans.

143.    The effect of the practices complained of herein, has been to deprive Mr. Lambert of equal employment opportunities, terms benefits and conditions of employment and in turn adversely affect his status as an employee, because of his race, national origin, color, and sex/gender.

144.    Defendant has engaged in unlawful employment actions against Mr. Lambert in violation of Title VII, 42 U.S.C. 42 U.S.C. § 200e-2(a), by Dr. Evans subjecting Mr. Lambert to harassment hostile work environment because of his race - black African American and by discourage or promptly stop Dr. Evans unlawful actions and behaviors against Mr. Lambert, instead of encouraging or supporting it.

145.    As a direct and proximate result of SSC's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary damages and other relief.

## Count Three Violation of Title VII, 42 U.S.C. §§ 2000e, et seq. Retaliation

146.    Plaintiff hereby incorporates by reference the preceding paragraphs.

147.    Plaintiff engaged in activity protected by Title VII when he complained to SSC's management personnel Rita Vann, VP of Quality Improvement, and his boss, the Administrator Beth Neel, claiming racial harassment and hostility, and as a result he was terminated later the same day he complained.

148.    Defendant retaliated against Mr. Lambert, by terminating him after he reported Dr. Evans's racial discrimination, hostility and harassment to management, and for having challenged all Dr. Evans' false accusations and statements, including her falsely stating in the PIP meeting, and thereafter, as listed under paragraph 138 above, including Mr. Lambert calling Dr. Evans out on her lies, when she falsely claimed that she spoke to nurse manager named Michelle, at the facility, about residents showers and toe nails, when there was no such name or person at PRHRC, where Mr. Lambert worked.

149.     Defendants' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

150.     As a direct and proximate result of SSC's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary damages and other relief.

### Count Four Violation of Section 1981, 42 U.S.C. §§ 1981-1988
### Disparate Terms and Conditions of Employment based on Race

151.     Plaintiff hereby incorporates by reference the preceding paragraphs.

152.     Plaintiff is a person whose race is African American. SSC is an employer under 42 U.S. Code § 1981.

153.  Defendant's actions were intentional and unlawful. Defendant and its agents treated Mr. Briscoe as if because of his race, he did not deserve to enjoy the fruit of his labor – commensurate and comparative pay for the job he did, as his Caucasian counterparts.

154.     Under Section 1981, Plaintiff has the same right to enjoyment of all benefits, privileges, terms, and conditions of his employment as his Caucasian colleagues or counterparts whose races are different from his. However, Defendant intentionally treated him differently and unfavorably than other employees of the company, because of his race, when he was terminated and his request to transfer to other SSC facilities in the Maryland District he worked denied, while SSC granted transfers to other employees who were white Caucasian female, Directors of Nursing, in violation of 42 U.S. Code § 1981.

155.    Defendant discriminated against Mr. Lambert because of his race, when he was singled

out for termination and his boss, Ms. Elizabeth Neel, who is in charge, was not terminated

because she is a white Caucasian female, and even though the Family Council who pressured for

change of leadership included Ms. Neel. Mr. Lambert was also discriminated against because of

his race, when SSC offered Ms. Neel the option to transfer to SSC's two other facilities, but not

to Mr. Lambert and when he requested to transfer, SSC did not grant it.

156.    As a direct and proximate result of SSC's unlawful acts, Mr. Lambert suffered and

continues to suffer severe mental anguish and emotional distress, including but not limited to

anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to

an award of monetary damages and other relief.

### Count Five Violation of Section 1981, 42 U.S.C. §§ 1981-1988
### Harassment Hostile Work Environment Based on Race

157.    Plaintiff hereby incorporates by reference the preceding paragraphs.

158.  Defendant through the actions of its agent and employee, Dr. Evans, engaged in unlawful

employment actions against Mr. Lambert, based on his race, in violation of Section 1981, 42

U.S.C. §§ 1981-1988, by subjecting him to harassment and hostility, threatening and humiliating

treatment, that permeated his working environment and prevented him from doing his work,

which was offensive, unwelcome, and unacceptable to Mr. Lambert.

159.    All of the foregoing conducts were based on Plaintiff's race. And Mr. Lambert perceived

the hostile work environment Dr. Evans created by her false allegations, harassment and hostility

to be racially abusive and unlawful.

160.    Dr. Evans's harassment and hostility against Mr. Lambert, was offensive, unwelcome,

unacceptable to Mr. Lambert.

161.    Dr. Evans's harassment and hostility against Mr. Lambert, were severe, pervasive, and altered the conditions of his employment, because they created an abusive and hostile work environment, for him and ultimately resulted in him being fired after he complained about them.

162.    Dr. Evans's harassment, hostility, and false allegations against Plaintiff unreasonably interfered with Plaintiff's work performance, when he could not peacefully discuss with his boss in her office, or concentrate with his work in his own office, without hostile interruption by Dr. Evans, and when he was made by Dr. Evans, to waste precious time, fetching reports, and answering to unfounded issues deliberately concocted to undermine him, by Dr. Evans.

163.    The effect of the practices complained of herein, has been to deprive Mr. Lambert of equal employment opportunities, terms benefits and conditions of employment and in turn adversely affect his status as an employee, because of his race, national origin, color, and sex/gender.

164.    As a direct and proximate result of SSC's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary damages and other relief.

165.    Defendant harassed and subjected Plaintiff to disparate working conditions and a hostile work environment of Mr. Lambert, and through its Caucasian employee Dr. Evans's conducts that let him to report her, and that ultimately caused his termination, including, inter alia:

166.    By targeting, and singling out Mr. Lambert, at a meeting, and making assertions that she knew were untrue just to humiliate, intimidate and impugn on his   professional abilities, and his character; Publicly yelling at and disrespecting Plaintiff; Standing too closely in Plaintiff's

personal space, and aggressively and loudly calling him a liar, when Dr. Evans knew that was

not the case; Telling the interim DON Katherine Gaines that Mr. Lambert was lying when Dr.

Evans knew that to be false; Intimidatingly, disrespectfully, and confrontationally demanding

that Plaintiff come out of his boss's office immediately while Plaintiff was discussing with his

boss; Publically standing in an aggressive, intimidating, and threatening manner in his face and

space, that caused him to take 3 steps backwards from Dr. Evans; Standing in an intimidating,

aggressive, threatening, and confrontational manner in front of Plaintiff in his office, over his

desk, and disrespectfully in angry and loud voice, yelling and demanding that he produce

residents' shower and podiatry records; Implicitly attacking Plaintiff's leadership and job

performance; Overt, covert, and tacit encouragement to the Family Council's unfounded attack

on Plaintiff's leadership; Undermining his leadership by questioning him about matters that Dr.

Evans herself said allegedly took place while Plaintiff was on seven weeks FMLA leave; and

more, as also listed under paragraph 138 above.

167.    The effect of the practices complained of herein, has been to deprive Mr. Lambert of

equal employment opportunities, terms benefits and conditions of employment and in turn

adversely affect his status as an employee, because of his race.

168.    As a direct and proximate result of SSC's unlawful acts, Mr. Lambert suffered and

continues to suffer severe mental anguish and emotional distress, including but not limited to

anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to

an award of monetary damages and other relief.

### Count Six Violation of Section 1981, 42 U.S.C. §§ 1981-1988
### Retaliation

169.    Plaintiff hereby incorporates by reference the preceding paragraphs.

170.    Plaintiff engaged in activity protected by Title VII when he complained to SSC's management personnel Rita Vann, VP of Quality Improvement, and his boss, the Administrator Beth Neel, claiming racial discrimination, harassment and hostility, and as a result he was terminated later the same day he complained.

171.    Defendant retaliated against Mr. Lambert, by terminating him after he reported Dr. Evans's racial discrimination, hostility and harassment to management, and for having challenged all Dr. Evans' false accusations and statements, including her falsely stating in the PIP meeting, and thereafter, as listed under paragraph 135 above, including Mr. Lambert calling Dr. Evans out on her lies, when she falsely claimed that she spoke to nurse manager named Michelle, at the facility, about residents showers and toe nails, when there was no such name or person at PRHRC, where Mr. Lambert worked.

172.    Defendants' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

173.    As a direct and proximate result of SSC's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary damages and other relief.

### Count Seven Violation of Maryland Fair Employment Practices Act, MD. Code Ann. State Gov't § 20-601 et seq. On the Basis of Race, National Origin, Color, and Sex/Gender

174.    Plaintiff hereby incorporates by reference the preceding paragraphs.

175.    At all relevant times, Plaintiff was an "employee" as defined by FEPA.

176.    Plaintiff is Black/African American and, thus, a member of a protected class.

177.    SSC is an "employer" as defined by FEPA and has engaged in unlawful employment practices and unlawful employment discrimination, including harassment/hostility, and terminating Plaintiff's employment based upon Plaintiff's race.

178.    Dr. Evans is an agent of Defendant SSC, is an employee of Defendant SSC, and personally engaged in racial discriminatory conducts as alleged herein.

179.    Plaintiff suffered an adverse employment action on February 13, 2019, when SSC and its management discharged Plaintiff from its employment based upon his race.

180.    At the time of the adverse employment action, Plaintiff was performing his job duties satisfactorily.

181.    Mr. Lambert is an African American man, and SSC and its management were aware of this, and his race was a motivating factor in Defendant's unfair treatment and decision to terminate him.

182.    Plaintiff was treated differently than non-African American/Black employees (white Caucasian Americans).

183.    Plaintiff's counterpart Directors of Nursing, including his boss Elizabeth Neely, who are white Caucasian Americans, were treated more favorably and were not subjected to the same adverse treatments as he was. Mr. Lambert was terminated and his request to be transferred to another SSC facility was denied while other similarly situated, were allowed or given transfer options by SSC, and none was terminated.

184.    Further, SSC and its management's termination of Plaintiff on February 13, 2019, was in retaliation for Plaintiff's legitimate exercise of his civil rights, in complaining that he was being harassed, treated differently and unfairly, in a hostile, threatening, intimidating and humiliating manner by Dr. Evans, based upon his race.

185.    Defendant and Dr. Evans's actions were intentional, wrongful, and malicious.

186.    Terminating the Plaintiff on account of his race is a violation of Maryland

State Gov't Article, § 20-606, et seq.

187.    As a result of his termination, in violation of SG § 20-606, Mr. Lambert suffered pain and

loss and has been damaged.

188.    Because of SSC's actions, Mr. Lambert suffered humiliation, financial injury, emotional

distress, depression and anxiety, and developed high blood pressure, and suicidal ideation, as a

result of the discriminatory way Defendant and its agents treated him, his termination and the

attendant loss of his medical health insurance, at a time he and his family needed it most,

Defendant and its agents, intentionally and unlawfully deprived Plaintiff of his rights and

privileges as their employee, on the basis of his race, in violation of  FEPA, Md. Code A., State

Gov't § 20-606.

189.    As a direct and proximate result of SSC and its agents and management's unlawful acts,

Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress,

including but not limited to anxiety and depression, elevated high blood pressure, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and

suffering for which he is entitled to an award of monetary compensatory damages, punitive

damages, attorney's fees, costs, and other appropriate relief.

## Count Eight Infliction of Emotional Distress

191.    Plaintiff hereby incorporates by reference the preceding paragraphs.

192.    Defendant SSC, unlawfully terminated Mr. Lambert, and cut off his medical health

insurance, and knowingly, willfully and intentionally left him without health insurance cover for

himself, but especially for his wife, who just had emergency Caesarian Section, birth of premature triplets.

193.    Mr. Lambert's wife and premature triplet newborn children, had serious medical issues and needed unusual and extended medical treatment, which Mr. Lambert informed Defendant SSC of, and requested FMLA leave, extension of that leave, and intermittent FMLA leave.

194.    Instead of approving the extension and the intermittent FMLA leave requests, Defendant SSC, and its management, terminated Mr. Lambert's employment with it, and with that, terminated also his job medical health insurance that his wife and children depended on.

195.    As a result, Mr. Lambert's wife who as a result of her pregnancy and birth of triplets, developed high blood pressure and required medications with monitoring for constant headaches, dizziness, fatigue, continuing vaginal bleeding, and care for her surgical wound, and required weekly physician's visits was deprived of medical treatment.

196.    Mr. Lambert's premature triplets, who required regular doctor's checkup visits was deprived of medical care, and especially one of them, who developed breathing problem. Mr. Lambert's children could not see their physician because Mr. Lambert had no health insurance the doctor will not see the children without insurance.

197.    Mr. Lambert laments: "Those were the most painful days of my life, watching my wife suffer serious medical issues without treatment, and helplessly watch my premature newborn triplets who were very sick and require constant medical attention and follow ups, labor to survive without medical care, because their dad was terminated, and so, lost his job's medical health insurance coverage, and as an extension, their medical health insurance coverage, just because he is a black man from Cameroon."

198.    Defendant SSC's action in terminating Mr. Lambert in the circumstances, was unlawful, intentional, willful, and reckless.

199.    Defendant SSC's action in terminating Mr. Lambert in the circumstances, was unconscionable and outrageous.

200.    Defendant SSC's action in terminating Mr. Lambert in the circumstances, is the direct and proximate cause of his emotional distress.

201.    The emotional distress that Mr. Lambert suffered as a result of Defendant SSC's termination of him, which resulted in him losing his job medical insurance cover for him, and his family, and especially when he needed it most, and Defendant knew how crucial and life impacting to his wife and premature triplets, is very severe.

202.    As a direct and proximate result of SSC and its agents and management's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary compensatory damages, punitive damages, attorney's fees, costs, and other appropriate relief

## Count Nine Violation of the FMLA, 29 U.S. Code § § 2601 et seq.
## Interference with FMLA Rights

203.    Plaintiff hereby incorporates by reference the preceding paragraphs.

204.    Leave may be taken under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA.") by an eligible employee in order to care for the employee's minor child or wife with a serious health condition.

205.    Mr. Lambert was terminated on February 13, 2019, while his FMLA leave request for two weeks extension and intermittent FMLA leave approvals were pending.

206.     Plaintiff was an eligible employee under the FMLA, because he had been employed by the Defendant for over twelve months prior to seeking FMLA leave for her son's serious health condition, and had been employed for at least 1,250 hours of service with the Defendant during the 12 month period preceding her request for FMLA leave.

207.     Mr. Lambert's wife gave birth to premature triplets by emergency Caesarian Section and after giving birth, as a result of her high risk pregnancy, his wife was having serious medical issues. She developed high blood pressure and required medications with monitoring for constant headaches, dizziness, fatigue, continuing vaginal bleeding, and care for her surgical wound. His wife required weekly physician's visits.

208.     On November 14, 2018, Mr. Lambert's wife gave birth to their triplets at 34 weeks of gestation through an emergency caesarean section at John Hopkins Hospital in Baltimore, with birth weights of 4.9lbs, 4.2lbs, and 4.0 lbs. All the babies were taken to the Neonatal Intensive Care Unit where they stayed there until their discharge from the hospital on December 23, 2018. Mr. Lambert's newborn premature triplets, were having serious medical issues. They needed constant medical monitoring and physician's visits. And one of them, his daughter Hannah, had serious breathing problem that needed medical attention.

209.     After his wife gave birth to premature triplets, Mr. Lambert requested for FMLA, and gave notice to his employer as to the length of time he will be needing leave, including an extra two weeks leave to the end of February 2018, and intermittent leave thereafter, due to the fact that his wife needs his assistance going forward with her doctor's visits and that of the triplets. and that he will be needing intermittent FMLA leave going forward because of his wife serious health issues and his premature triplets who will be needing medical checkups.

210.    Terminating the Plaintiff because she exercised her rights under the FMLA constitutes interference with her right to take leave, without interference by the employer. Defendant's unlawful actions, in terminating the Plaintiff, were intentional, willful, and recklessly taken, in disregard of Mr. Lambert's rights.

211.    As a direct and proximate result of SSC and its agents and management's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary compensatory damages, punitive damages, attorney's fees, costs, and other appropriate relief.

### Count Ten Violation of the FMLA, 29 U.S. Code § § 2601 et seq. Retaliation for Exercising FMLA Rights.

212.    Plaintiff hereby incorporates by reference the preceding paragraphs.

213.    Terminating the Plaintiff because she exercised, or attempted to exercise her rights under the Family Medical Leave Act, constitutes retaliation in violation of 29 U.S.C. § 2615(a).

214.    As a result of the retaliation, the Plaintiff has been damaged.

215.    As a direct and proximate result of SSC and its agents and management's unlawful acts, Mr. Lambert suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to anxiety and depression, elevated high blood pressure, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and pain and suffering for which he is entitled to an award of monetary compensatory damages, punitive damages, attorney's fees, costs, and other appropriate relief.

216.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained loss of earnings, earning capacity, fringe benefits among other damages already provided in the preceding paragraphs.

**WHEREFORE,** Plaintiff requests that this Honorable Court enter judgment against Defendant for the following:

1. Lost wages and Back Pay;

2. Front Pay in lieu of Reinstatement;

2. Punitive damages in an amount the Court deems sufficient;

3. Emotional distress and Consequential damages;

4. Interest, costs, and reasonable attorneys' fees and any other relief to which Plaintiff is justly entitled.

5. Enjoin Defendant from future similar discriminatory and retaliatory actions.

## DEMAND FOR JURY TRIAL

TRIAL BY JURY IS DEMANDED ON ALL ISSUES TRIABLE BY JURY.


Respectfully submitted this 22nd day of September 2020,


*/s/ Stephen Christopher Swift*
Stephen Christopher Swift
Maryland Federal Bar No. 13,943
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205
E-mail: steve@swift.law.pro

*Attorney for Plaintiff*
*Ndive Mongo Lambert*