## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **NDIVE MONGO LAMBERT,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: DLB-20-2768** |
| **SAVASENIORCARE ADMINISTRATIVE** | * | |
| **SERVICES, LLC,** *et al.*, | * | |
| **Defendants.** | | |

### MEMORANDUM OPINION

Ndive Mongo Lambert filed suit against his former employers, SavaSeniorCare Administrative Services, LLC ("SSC") and SSC Laurel Operating Company d/b/a Patuxent River Health & Rehabilitation Center ("Patuxent"). Lambert claims the defendants terminated his employment for discriminatory and retaliatory reasons. He brings ten claims: violations of Title VII, 42 U.S.C. § 2000e *et seq.*, for discrimination based on his race, national origin, color, and gender, including disparate treatment (Count I), a hostile work environment (Count II), and retaliation (Count III); violations of 42 U.S.C. § 1981 based on the same conduct (Counts IV, V, and VI); a violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq.* ("MFEPA"), for disparate treatment and a hostile work environment (Count VII); intentional infliction of emotional distress (Count VIII); and violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), based on interference with his FMLA rights (Count IX), and retaliation for exercising his FMLA rights (Count X).

The parties have filed cross-motions for summary judgment. ECF 46 & 51. The motions have been fully briefed. ECF 53 & 61. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the defendants' motion is granted in part, and Lambert's motion is denied.

Judgment is entered in favor of the defendants on Counts I, II, III, IV, V, VII, and VIII.  Because there are genuine disputes of material fact on Counts VI, IX, and X, a jury shall decide those counts.

## I.     Background

Patuxent is a long-term skilled nursing and rehabilitation facility located in Laurel, Maryland.  ECF 46-4, at 18 (65:2–5).  SSC operates Patuxent, among other nursing facilities across the country.  Lambert is a Black, African American man of Cameroonian origin.  ECF 46-4, at 14 (48:4–9); ECF 46-8.  He is a registered nurse.  ECF 46-4, at 14 (49:12–16).  He began working at Patuxent in May 2015 as the Director of Nursing.  *Id.* at 17–18 (60:8–10, 63:1–2).  He was "the No. 2 in the building" and responsible for the nursing department and the clinical outcomes of the facility.  *Id.* at 19, 33 (66:12 – 67:16, 125:17–21); ECF 46-7, at 12 (38:13–17).  His duties included conducting performance reviews, maintaining medical and nursing records, and generally ensuring that nursing staff provided quality care that met or exceeded company and regulatory standards and was appropriate to residents' needs.  ECF 46-4, at 19–20 (67:17 – 73:20); ECF 46-5; ECF 46-6, ¶ 11.  Lambert's direct supervisor was Elizabeth Neel, Patuxent's Administrator.  ECF 46-4, at 17 (60:11–16); ECF 46-7, at 12 (40:7–16).  Neel is a white, Caucasian, American-born woman.  ECF 46-7, at 4 (9:11–14); ECF 46-9, ¶ 12: ECF 46-10.  Neel was responsible for the overall operation of the facility, but she was not directly responsible for managing the nursing department and did not possess a nursing degree.  ECF 46-7, at 9 (27:17 – 29:13).

Neel testified via affidavit that Patuxent was "in the midst of a clinical downward trajectory" when Lambert joined.  ECF 51-11, ¶ 2.  Lambert worked "many hours over the customary 40-hour workweek" to right the ship, and "he began to cultivate a culture of respect amongst the staff."  *Id.* ¶¶ 4–5.  During his tenure, Patuxent improved its Centers for Medicare &

Medicaid Services ("CMS") star ratings, from 3 to 4 stars overall and from 3 to 5 stars regarding quality measures. *Id.* ¶ 6. Additionally, there were "fewer reported deficiencies and complaint surveys were at an all-time low." *Id.* Under Neel and Lambert, Patuxent secured SSC's 2017 Blue Ribbon Award for the Maryland region, awarded based on measurements of environmental excellence, employee experience, customer experience, business process, and quality care. *Id.* ¶ 7. Neel and Lambert also secured the 2017 SSC CEO Roundtable award, reflecting "financial excellence, quality excellence, and overall meeting the top-level targets for all [SSC] facilities." *Id.* ¶ 9. At the CEO Roundtable celebration, SSC's CEO Tony Oglesby had a personal meeting with Neel and Lambert, during which he praised their "exceptional leadership and clinical expertise." *Id.* ¶ 10.

There were, however, concerns about the quality of care at Patuxent voiced by the families of the residents. Family members of Patuxent's residents may join a "Family Council" that works in partnership with the facility. ECF 46-4, at 26 (96:1–6). The Family Council discusses issues affecting the care and safety of residents, establishes action plans to resolve issues, and communicates with Patuxent's management. *Id.* at 26–27 (97:14 – 99:11); ECF 46-6, ¶ 3. While Lambert was Director of Nursing, the Family Council often expressed concerns about the quality of care at Patuxent, including staffing shortages, patient care, nurses' bedside manners, and documentation errors. ECF 46-4, at 27, 29, 30–32 (99:5 – 100:16, 108:3–7, 113:11 – 118:16); ECF 46-7, at 13, 17 (43:9 – 44:15, 59:4–7); ECF 46-12. Some of these concerns overlapped with deficiencies identified by the Maryland Department of Health in its May 2017 annual survey of Patuxent. ECF 46-4, at 30–31 (113:11 – 114:12). The Family Council shared its concerns, particularly staffing concerns, with management and various state officials. *Id.* at 27–28 (100:20 – 102:4). The Family Council kept a spreadsheet noting its concerns and tracking efforts to address

them.  *Id.* at 28–29 (103:15 – 106:11); ECF 46-11.  Versions of this spreadsheet from September 2017 and September 2018 note concerns about areas both within and outside of Lambert's responsibilities as Director of Nursing.  ECF 46-4, at 30–33 (111:7 – 117:17, 121:21 – 125:16); ECF 46-7, at 13–17 (43:9 – 58:19).  Lambert attended several meetings with the Family Council and was aware of its concerns.  ECF 46-4, at 27 (98:12 – 99:11); ECF 46-7, at 15 (52:20 – 53:3).

In September or October of 2018, members of the Family Council met with Neel, Oglesby, and state officials at the Maryland Department of Health Office of Health Care Quality ("OHCQ") to discuss the Council's ongoing concerns.  ECF 46-4, at 34–35 (126:3 – 131:1); ECF 46-7, at 19 (67:21 – 69:20).  The Family Council requested a change in leadership at Patuxent, including the replacement of Neel and Lambert.  ECF 46-4, at 34–35 (126:3 – 131:1); ECF 46-7, at 20 (70:6–15).  Oglesby defended Lambert and Neel and privately assured them there would be no change in leadership.  ECF 46-4, at 47 (179:14 – 180:1); ECF 46-7, at 29 (107:17 – 108:1).  Following the meeting, OHCQ conducted surveys of Patuxent.  ECF 46-4, at 35 (130:16 – 131:1); ECF 46-7, at 20 (70:16–19).  One of the surveys identified several deficiencies, including in areas of patient care.  ECF 46-4, at 36 (134:4 – 137:16).  Another survey reported no deficiencies.  *Id.* at 65–66 (253:11 – 254:1).  In early December, Lambert and Neel prepared Performance Improvement Projects ("PIPs"), including goals and plans to achieve them, as part of a process to correct some of the noted deficiencies.  *Id.* at 37–38 (141:2 – 144:16); ECF 46-7, at 20 (72:3–19); ECF 46-14; ECF 46-15.  PIPs were a usual occurrence at Patuxent and were integrated into the facility's broader quality assurance performance improvement plan.  ECF 46-7, at 21 (75:17 – 76:17).  The December PIPs prepared by Neel and Lambert concerned "meal times, snacks and hydration" and "quality of care."  ECF 46-14; ECF 46-15.  Lambert testified that these PIPs were not based on new issues and that the Family Council had been complaining about the same problems, which

4

Lambert stated arose from a "chronic shortage of staff," since before he started working at Patuxent.  ECF 46-4, at 50–51 (192:15 – 194:21).

On November 14, 2018, Lambert's wife gave birth to premature triplets.  ECF 46-4, at 42 (160:14 – 161:5).  The infants were placed on a ventilator, and Lambert's wife developed high blood pressure, bleeding, and severe headaches.  *Id.*  In December, Lambert requested FMLA leave to care for his wife and children, notifying Neel and Katie Harnsberger, a Human Resources representative.  ECF 46-4, at 42 (160:6–12); ECF 46-7, at 26 (95:10–17); ECF 46-16.  The documentation Lambert submitted indicated that he required leave from December 26 to January 16, 2019 and that he might require intermittent leave between January 17 and March 26.  ECF 46-16, at 4.  His initial FMLA request was approved.  ECF 46-4, at 43 (162:9 – 163:13); ECF 46-7, at 26–28 (95:10 – 102:2).  In January, Lambert emailed Harnsberger and Neel that he needed to extend his FMLA leave until February 7.  ECF 46-17, at 7; ECF 46-18, at 3.  The extension also was approved.  ECF 46-4, at 44 (169:17–19).  On January 31, Lambert informed Neel and Harnsberger that he would require another FMLA form for additional leave at the end of February. ECF 46-19, at 2.

Meanwhile, the Family Council continued to press its concerns about Patuxent.  On November 16, a representative of the Family Council emailed Stacey Hallissey, SSC's Senior Vice President of Rehabilitation Services and Interim President of the Northeast District (including all Maryland facilities), sharing the Council's concerns and providing documentation.  ECF 46-20; ECF 46-21, ¶¶ 3–4.  Hallissey began visiting Patuxent on a weekly basis and attending monthly meetings with the Family Council.  ECF 46-21, ¶ 6.  Hallissey later forwarded the Family Council's email to Christopher Jedd Rawlins, SSC's new Vice President of Operations for the Northeast Division, who had joined the organization in December 2018.  ECF 46-20; ECF 46-22,

at 6, 10–11 (12:5–8, 29:6 – 31:2).   Rawlins also began visiting Patuxent and attending Family Council meetings.  ECF 46-6, ¶ 5.  Rawlins had limited clinical expertise.  ECF 46-22, at 6 (13:17–21).  Rawlins and Hallissey worked with clinicians Rita Vann and Dr. Mary Evans to investigate the Family Council's concerns.  ECF 46-21, ¶ 7; ECF 46-22, at 6–7, 22, 50 (13:15 – 16:10, 76:5 – 77:1, 189:2–11); ECF 46-24, ¶ 4.  Vann was Vice President of Quality Improvement at SSC, ECF 46-24, ¶ 3, and Dr. Evans was the Chief Medical Officer, the "highest doctor in the organization," ECF 46-9, ¶ 4; ECF 46-7, at 32 (121:3–8).  Vann testified via declaration that she visited Patuxent twice with Dr. Evans, once in January and again on February 13.  ECF 46-24, ¶ 4.

Towards the end of January, while Lambert was still on FMLA leave and while Hallissey, Rawlins, Vann, and Dr. Evans continued to investigate Patuxent, Lambert requested a transfer to an open Director of Nursing position at a different facility.  ECF 46-26.  His request stated he had "been thinking about how to solve the concerns raised by the Family Council."  *Id.*  Despite changes he had implemented, he knew the Family Council continued to seek a change in leadership, so he believed transfer to a different facility was the best course of action and would allow both Patuxent and him "to continue to be successful."  *Id.*; ECF 46-4, at 46 (174:10 – 175:18).  In his email requesting transfer, Lambert identified accomplishments from his time at Patuxent, including the improved star ratings and the Blue Ribbon and CEO Roundtable awards.  ECF 46-26.  Upon learning of Lambert's request for transfer, Hallissey notified Rawlins and tasked him with responding.  ECF 46-21, ¶ 8; ECF 46-22, at 8 (19:17–18).  In a January 23 email, she stated "I'm not sure it is [in] our best interest to keep [L]ambert."  ECF 46-27.

Lambert returned to work on February 7 or 8, awaiting approval of his latest request for additional leave at the end of February.[1]   ECF 46-4, at 46 (174:5–9).   In a February 8 email to Beth Murray, a Human Resources director, Rawlins stated "I guess Lambert is back today.   We have to deal with that pretty quick as . . . he is planning to be on intermittent FMLA and be off again in 2 weeks."   ECF 51-10, at 2.   Murray responded, "Oh boy – that complicates things under FMLA protection as well.   We'll figure it out."   *Id.*

On February 13, 2019, Lambert met with Neel, Vann, Dr. Evans, and interim Director of Nursing Katherine Gaines to discuss Patuxent's PIPs.   ECF 46-4, at 49 (187:11–20).   Vann reviewed the PIPs and said Lambert and Evans were doing a "great job."   *Id.* (189:1–11); ECF 46-7, at 33 (122:5–7).   Dr. Evans then said she performed audits while Lambert was on leave, including talking to an employee named Michelle, and she found residents who had not had their nails trimmed for more than six months.   ECF 46-4, at 50 (190:4–11).   She also stated residents were not receiving showers and she had not been able to find documentation related to bathing.   *Id.* at 51 (195:18 – 196:5).   Lambert disputed her assertions, including that there was ever an employee named Michelle, and provided documentation related to bathing and podiatry care.   *Id.* (196:6 – 197:19).   Regarding Dr. Evans' concerns, Neel testified that the podiatrist visited Patuxent regularly and that she did not recall Dr. Evans visiting Patuxent during Lambert's leave.   ECF 46-7, at 33, 35 (123:7–21, 133:5–10).

---

[1] Neel submitted a letter of resignation on February 8, shortly after Lambert returned to work.   ECF 46-7, at 32 (119:6–14); ECF 46-29.   A few weeks prior, Rawlins and Hallissey had offered her a transfer to two different SSC facilities.   ECF 46-7, at 31 (115:20 – 117:9).   Neel accepted the latter offer after declining the former because it was farther away from her home.   *Id.*   Neel resigned before the transfer because she was offered a preferable position at a non-SSC facility.   *Id.* at 31 (117:5–20).   She testified the timing of her resignation relative to Lambert's return was coincidental.   *Id.* at 32 (120:10–12).

The meeting ended and Lambert went to Neel's office to talk to her.  ECF 46-4, at 52 (198:17–21).  Lambert testified Dr. Evans showed up and started shouting that the documentation he had provided was false.  *Id.* (199:1–21).  Dr. Evans walked into his personal space, and he backed up in response.  *Id.*  Neel described the interaction similarly: Dr. Evans interrupted her conversation with Lambert, asked him to retrieve the podiatry logs immediately, and "came towards him into his personal space being very emphatic that she wanted them right then."  ECF 46-7, at 38 (144:4–21).  Neel described Dr. Evans as seeming "very angry in her tone and her demeanor," more so to Lambert than to her.  *Id.* at 39 (146:6–19).  After this interaction, Dr. Evans left, and Lambert returned to his office.  ECF 46-4, at 52 (199:1–21).  About 30 minutes later, Dr. Evans came into Lambert's office and again accused him of lying about the documentation.  *Id.*  Lambert repeated that all the information was accurate.  *Id.*  Lambert left his office and reported Dr. Evans' behavior to Vann, with Neel present.  *Id.* (200:1–13).  Regarding the report to Vann, Neel testified Lambert said Dr. Evans was being very hostile and making him uncomfortable, ECF 46-7, at 39 (147:4–9), and Lambert testified he specifically complained that Dr. Evans' accusations and hostile manner constituted racial discrimination and created a hostile environment, ECF 46-4, at 55 (210:1–8).  Vann said she would take care of it, and Lambert returned to his office.  *Id.* at 52 (200:10–13).

Later that day, Rawlins met with Vann and Dr. Evans at Patuxent to discuss their evaluation of the facility, and Rawlins asked Vann to prepare a written summary.  ECF 46-6, ¶ 8.  In an email on February 13, Vann summarized the team's concerns as follows:

- DON [Lambert] does not attend Clinical Meeting in the morning.

- Hydration Program not in place although PIP was put in place.

- Pain Management concerns – Resident concerns of not getting meds timely after Admission.  DON stated there was no problem in receiving medications.

- Infection Control rounds are not consistently occurring as evidence[d] by multiple issues noted on rounds.

- Lack of resident nail care – identified in December on rounds with resident who had nails that had not been trimmed in some time.  Log of podiatrist visits document[s] few residents seen (compared to census).  DON states that toenails are trimmed by staff if not diabetic.

- Nursing assignments are not consistent between units.

- Lack of system to ensure all residents receive their baths as scheduled or documentation (in record) of refusal.  No system of oversight by DON other than collecting "bath sheets".  DON could not produce audit tool for showers.

- Interviewed staff member who described DON as a "bully" and "not approachable."

- Multiple concerns voiced by facility Family Council regarding care at the facility.

ECF 46-25.  Vann testified via declaration that the team determined insufficient progress had been made in implementing the PIPs and "the clinical product at Patuxent River Center under Mr. Lambert's leadership had failed."  ECF 46-24, ¶¶ 5–7.  Hallissey was not present for the February 13 meeting but recalled reaching the same conclusions, adding that she "personally validated the fact that residents were not receiving routine podiatry care."  ECF 46-21, ¶ 7.  Neither Hallissey nor Rawlins had identified any issues or deficiencies to Neel when they visited Patuxent during Lambert's leave.  ECF 46-7, at 38 (142:12–16).

That afternoon, Lambert was terminated and offered a severance package.  ECF 46-4, at 52 (200:18–19, 201:11–13).  He was not given a reason for his termination.  *Id.* at 53 (203:17–20).  He also was not given an option to transfer.  ECF 46-22, at 6 (10:19 – 11:1).  Rawlins testified he made the decision to deny Lambert's request for transfer.  *Id.* at 8 (19:17–18).  However, he described the decision to terminate Lambert as one "made as a committee" between himself and Hallissey, Vann, and Dr. Evans, whom he regarded as clinical experts.  *Id.* at 6–8, 22, 59 (11:21 –

16:10, 17:7–12, 19:17–18, 75:7 – 77:1, 225:9–17).  Based on the clinicians' investigation, Rawlins

determined Lambert displayed "poor performance" and "there was no indication from him that he

intended to approve."  *Id.* at 6–8, 17 (10:19 – 11:1, 16:18 – 17:5, 57:2–17).  Specifically:

> The communication from the folks that I was getting was that . . . [Lambert] would
> not concede that he had done anything wrong.  So when he was being shown . . .
> what the issues were, in order to improve, you would have to . . . have some
> concession that something had gone wrong. . . . But that's what they were
> communicating to me; that not only . . . is this clinical product in such terrible sham
> [sic], but the leader that would have to improve the clinical product won't take any
> responsibility for what's gone wrong with the product.

*Id.* at 27 (94:1–15).  Rawlins testified he would not "transfer a poor performer from one facility to

another," and he did not allow any other poor performers to transfer under his supervision.  *Id.* at

6 (11:6–20).  He trusted the assessments of his team of clinicians and did not see any need to meet

with Lambert himself.  *Id.* at 49, 52 (182:6–19, 183:16 – 184:4, 194:5–20).  The Family Council's

concerns and request for Lambert's removal prompted the team's investigation of Patuxent but did

not otherwise influence the decision to terminate Lambert.  *Id.* at 55 (206:2–13).

At the time the decision to terminate Lambert was made, Rawlins was not aware of

Lambert's complaint regarding Dr. Evans.  *Id.* at 61 (231:18 – 232:12).  Rawlins also did not know

about Patuxent's recent awards or whether Lambert had a disciplinary history.[2]  *Id.* at 16–17 (53:8

– 56:11).  He testified he did not need information about past performance because his focus was

on the current circumstances and poor clinical outcomes.  *Id.* at 16–17, 22 (53:8 – 56:11, 75:7 –

77:1).  Rawlins was aware that Lambert had been on FMLA leave, *id.* at 27 (95:17–21), and that

he had requested additional intermittent leave, ECF 51-10, at 2.  Following Lambert's termination,

---

[2] When presented with the list of accomplishment and awards Lambert provided with his request
for a transfer, Rawlins stated, assuming the statements were true, "I would think based on these,
that they did a good job with these measures. . . . I would say that somebody did a commendable
job on lots of things that pulled together to make those all happen."  ECF 46-22, at 31 (111:4–20).

several other employees at Patuxent were demoted.  ECF 46-7, at 42 (158:6 – 159:7).  Lambert was succeeded as Director of Nursing by a Black woman of Haitian origin.  ECF 46-9, ¶ 5.

After his termination, Lambert and his family lost their health insurance coverage.  ECF 46-4, at 62 (239:3–4).  Lambert was offered continuation of health coverage for up to 18 months under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), but he did not enroll because he could not afford the $1,900 monthly cost.  *Id.* (238:19 – 240:5).  He enrolled in Medicaid in April.  *Id.* (241:2–10).  Lambert testified that because of his termination and loss of healthcare coverage, he began suffering from emotional distress, anxiety, and depression.  *Id.* (241:11–14).  He was not diagnosed with these conditions at any time prior to his termination.  *Id.* (241:15–18).  His symptoms included "sleepless nights, anxiousness, thoughts of [suicide], constant headache, [and] elevated blood pressure due to lack of sleep."  *Id.* at 62–63 (241:19 – 242:4).  He visited his primary care physician twice and was prescribed medication for his depression.  *Id.* (243:1–18).  He did not seek psychological help.  *Id.* at 63 (242:15–20).

Lambert digitally signed an Equal Employment Opportunity Commission ("EEOC") charge of discrimination against SSC on June 13, 2019.  ECF 46-28.  The charge claims Lambert's discharge and denial of transfer were discriminatory and motivated by his race and national origin.  *Id.*  On September 22, 2020, Lambert filed this lawsuit.  After a lengthy discovery period, Lambert and the defendants filed cross-motions for summary judgment on Lambert's ten-count complaint.

## II.    Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When presented with cross-motions for summary judgment, the Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment

as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (citation and internal punctuation omitted)).   The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).   The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted).   However, the Court must also abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial.'" *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).   A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).   "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).   "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, 'citing to particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty., Va.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

III.    **Discussion**

Both sides move for summary judgment on all claims.  The Court addresses the claims in order and refers to preceding discussion where issues overlap between claims.

### A.  Evidentiary Objections

As a preliminary matter, the defendants challenge a significant portion of the evidence Lambert provided to oppose their motion and support his cross-motion.  First, they argue the Court should strike the sworn statements of two witnesses, Rosemarie Rhodes and Camille Forbes-Scott, because Lambert failed to identify those witnesses during discovery.  Second, they argue Lambert's declaration should be disregarded because it parrots the allegations in his complaint.  Third, they argue that the Court cannot consider fourteen of Lambert's exhibits (ECF 51-3, 51-8, 51-9, 51-10, 51-14, 51-15, 51-16, 51-17, 51-18, 51-20, 51-21, 51-22, 51-27, & 51-28) because they have not been properly authenticated and would thus be inadmissible at trial.

#### 1.  Rhodes and Forbes-Scott

Lambert submitted a declaration from Rosemarie Rhodes, the Director of the EEOC's Baltimore Field Office, and an affidavit from Camille Forbes-Scott, SSC's former District Director of Clinical Services.  ECF 51-4 (Rhodes); 51-12 (Forbes-Scott).  The defendants object that these witnesses were not identified during discovery.  Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure provides that a party generally must provide, without waiting for a discovery request, information about "each individual likely to have discoverable information."  "Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule 26(a) or (e) is not allowed to use that witness to supply evidence on a motion."  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011).  "Escape from the sanction requires a showing that the failure to disclose is

substantially justified or harmless." *Id.* (citing Fed. R. Civ. P. 37(c)(1)).  To determine whether a

failure to disclose a witness was substantially justified or harmless, courts consider:

> (1) the surprise to the party against whom the witness was to have testified; (2) the
> ability of the party to cure the surprise; (3) the extent to which allowing the
> testimony would disrupt the trial; (4) the explanation for the party's failure to name
> the witness before trial; and (5) the importance of the testimony.

*Id.* (quoting *S. States Rack & Fixture v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003)).

Lambert notes that the scheduling and discovery orders in this case state "disclosures

required by Fed. R. Civ. P. 26(a)(1)(A)(i), (ii), and (iv) need not be made."  *See* ECF 19 & 20.  He

suggests this forecloses application of the sanction.  However, the defendants' interrogatories

requested Lambert identify "all persons who are likely to have personal knowledge of any fact

alleged in the pleadings[.]"  ECF 53-2, at 2.  In his response, Lambert did not name either Rhodes

or Forbes-Scott.  *Id.* at 2–5.  Because the defendants requested the identification of witnesses

during discovery, "case law discussing Rule 26(a) applies with equal force to this matter."  *See*

*Manguiat v. Bd. of Educ. of Prince George's Cnty.*, No. GJH-13-1165, 2015 WL 2376008, at *3

n.4 (D. Md. May 18, 2015).

Lambert offers three reasons why the Court nonetheless should consider Forbes-Scott's

affidavit.  First, he asserts he identified her as a potential witness during discovery, albeit not in

his response to the defendants' request for the identification of potential witnesses.  Second,

Lambert accuses the defendants of hypocrisy for submitting affidavits from Vann and another

witness, Luanne Estrada, despite not identifying either in their response to Lambert's interrogatory

requesting the identification of potential witnesses with personal knowledge of Lambert's

termination.[3]  Finally, Lambert turns to the factors informing whether a failure to disclose was

---

[3] Lambert has not requested the Court strike any of the defendants' exhibits nor identified
precedent supporting the relevance of hypocrisy, so the Court disregards this argument.

substantially justified or harmless and argues they weigh in his favor because there was no surprise

(and thus nothing to cure), the testimony is important and not disruptive, and his explanation for

the omission is cogent.

The Court will not consider Forbes-Scott's affidavit. Lambert did not disclose her as a

potential witness in response to a specific interrogatory asking for identification of people with

relevant information. It is true that Lambert's counsel later emailed opposing counsel proposing

a time for deposing several witnesses, including Forbes-Scott, and defendants' counsel responded

that Forbes-Scott was no longer employed by SSC and would need to be subpoenaed directly. But

following that response, Lambert's counsel requested contact information for two of the witnesses,

but not Forbes-Scott. There is no indication that Forbes-Scott was subpoenaed for a deposition or

that Lambert ever notified the defendants that he had obtained testimony from Forbes-Scott.

Lambert has not explained why he did not disclose Forbes-Scott as a potential witness during

discovery. With discovery closed and the parties' cross-motions for summary judgment fully

briefed, the defendants are now precluded from deposing her or otherwise probing her affidavit

testimony favoring Lambert, so the surprise cannot easily be cured. Last, Forbes-Scott's testimony

is of moderate importance. She testified about Lambert's work performance, but she left SSC in

October 2018, so her testimony reflects only his performance before that date. She also testified

that some of Patuxent's problems were due to short-staffing and outside Lambert's control. In

both areas, her testimony is largely cumulative to the other evidence in the record, primarily Neel's

testimony. However, Forbes-Scott also testified she is "well aware of many DONs who

transferred" and believes that in some instances "there was some racism demonstrated." ECF 51-

12, ¶ 20. This non-cumulative testimony should have been disclosed during discovery. Lambert's

failure to disclose Forbes-Scott as a witness was neither substantially justified nor harmless, and

her affidavit is stricken from the record.  Fed. R. Civ. P. 37(c)(1); *see also Manguiat*, 2015 WL 2376008, at *4 (striking declarations where the plaintiff failed to identify the witnesses adequately during discovery and the defendant lacked an opportunity to challenge the testimony).

The Court will, however, consider Rhodes' declaration.  Lambert's failure to disclose Rhodes as a witness was harmless because, as discussed below, Rhodes' testimony is of no import to the exhaustion analysis it is meant to influence.

### 2.  Lambert's declaration

The defendants object to Lambert's first declaration, ECF 51-13, as parroting the allegations in his complaint and urge the Court to strike it.  A party may not survive or secure summary judgment merely by replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). To the extent Lambert's declaration contains testimony that is conclusory and otherwise unsupported by the record, it does not influence the Court's analysis.  But the defendants have not provided authority that justifies striking the declaration in toto, and the Court declines to do so.

### 3.  Unauthenticated exhibits

The defendants also object to fourteen of Lambert's exhibits as improper evidence because they are not properly authenticated and would be inadmissible at trial.  These exhibits consist of U.S. Department of Justice press releases concerning SSC, various documents from Lambert's EEOC process, letters and spreadsheets listing the Family Council's concerns, emails produced during discovery, a letter an attorney representing Lambert sent to the defendants shortly after Lambert's termination, and medical documentation regarding Lambert's health.  Quoting a 1999 opinion of this Court, the defendants argue "[t]o be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of

Rule 56—that the documents be admissible in evidence." ECF 53, at 15 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

This objection is outdated. The authorities cited by the defendants—including *Orsi v. Kirkwood*, 999 F.2d 86 (4th Cir. 1993), the principal Fourth Circuit case upon which the other cited cases rely—all predate a 2010 amendment to Rule 56. *See Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 407 (D. Md. 2015) (noting *Orsi* "was 'superseded by an amendment to Rule 56' in 2010) (quoting *Wonasue v. Univ. of Md. Alumni Ass'n*, No. PWG-11-3657, 2013 WL 5719004, at *8 (D. Md. Oct. 17, 2013)); *see also* 10A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Pro.* § 2722 (4th ed. 2016) (discussing 2010 amendment). "Under the amended Fed. R. Civ. P. 56, 'facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the new requirement is that the party identifies facts that *could be* put in admissible form.'" *Williams*, 86 F. Supp. 3d at 407 (quoting *Wake v. Nat'l R.R. Passenger Corp.*, No. PWG-12-1510, 2013 WL 5423978, at *1 (D. Md. Sept. 26, 2013)). Rather than a bright-line rule, the amended Rule 56 now prescribes a multi-step process wherein, if the opposing party objects on admissibility grounds, "the burden is on the proponent [] to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* (quoting Fed. R. Civ. P. 56, adv. comm. notes, 2010 amendments) (modification altered).

The Court has reviewed the fourteen challenged exhibits and determined only two contain unique information relevant to the Court's analysis: in Exhibit 4 (ECF 51-8), the CMS star ratings for certain SSC facilities, and in Exhibit 6 (ECF 51-10), a February 8, 2019 email exchange between Rawlins and Murray about Lambert in which Murray remarks that Lambert's request for intermittent FMLA leave "complicates things . . . ." Lambert has articulated grounds for the admission of these documents. For the CMS star ratings, Lambert represents they are public

records available on the internet through the "Nursing Home Compare" feature on www.medicare.gov. ECF 61, at 11. For the email exchange between Rawlins and Murray, Lambert represents it was produced by the defendants in discovery. *Id.* The document is identified with a Bates stamp consistent with origin. Rawlins has been identified as a witness and could testify at trial as to the emails he sent and received, and Murray's statement would be admissible so long as it is not offered to prove the truth of the matter she asserts—that Lambert's request for leave in fact complicated things. *See* Fed. R. Evid. 801(c)(2). The Court will consider these documents as part of the record and disregard the remaining challenged exhibits.

### B. Count I – Title VII Disparate Treatment

Lambert claims the defendants violated Title VII by denying his transfer request and terminating him based on his race, color, sex, and national origin. "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits employment discrimination." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). The Act reaches "status-based discrimination" by providing "basic workplace protection such as prohibitions against employer discrimination on the basis of race, color, religion, sex, or national origin, in hiring, firing, salary structure, promotion and the like." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 42 U.S.C. § 2000e-2(a)).

The plaintiff in an employment discrimination case bears the burden of proving the defendant discriminated against him "because of a protected characteristic." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998) (citing *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 243 (4th Cir. 1982)). The burden of proof may be satisfied by "direct evidence or by circumstantial evidence . . . ." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1314 (4th Cir. 1993). Where, as here, a plaintiff does not allege direct evidence of employment discrimination, claims

under Title VII proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015). At the first step of the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case of employment discrimination. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to produce evidence showing a legitimate and non-discriminatory reason for the adverse employment action. *Id.* The burden then returns to the plaintiff to demonstrate by a preponderance of the evidence that the stated reason is pretext for discrimination. *Id.* "She may succeed in this either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To survive summary judgment, the plaintiff "must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing." *Guessous*, 828 F.3d at 218 (quoting *King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting)).

The defendants raise several arguments, including that Lambert has not exhausted his sex and color discrimination claims and that he cannot meet his initial burden because he has not identified appropriate comparators—other employees who were similarly situated, treated more favorably, and who do not share Lambert's traits. Lambert argues that he has "provided more than sufficient evidence to show that Defendant[s] discriminated against him, based on the stated bases." ECF 51, at 16. He asserts that several white, female, American-born Directors of Nursing with worse performance were granted transfers and not discharged.

### 1.  Exhaustion

As a threshold matter, the defendants argue that Lambert has not exhausted his discrimination claims based on color or sex because he did not check the boxes for those protected traits in his EEOC charge of discrimination.  Lambert admits he did not check the boxes for color or sex discrimination, but he contends he should not be faulted because he was not represented by counsel at the time and the EEOC has taken responsibility for the omissions.

Claims brought under Title VII are subject to an administrative exhaustion requirement. *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1850–51 (2019); *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)).  "An individual cannot bring suit until he has exhausted the administrative process." *Chacko*, 429 F.3d at 509 (citing 42 U.S.C. § 2000e-5(b), (f)(1)).  Title VII's exhaustion requirement "'ensures that the employer is put on notice of the alleged violations,' *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005), thereby giving it a chance to address the alleged discrimination prior to litigation." *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012).

The claimant must identify the grounds for discrimination in an EEOC charge of discrimination form.  The "allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996) (citing *King v. Seaboard Coast Line R.R.*, 538 F.2d 581, 583 (4th Cir. 1976)).  Thus, when a plaintiff's administrative charge alleges discrimination on one basis or one type of discrimination but he introduces another basis or type of discrimination in formal litigation, the new claims "will generally be barred[.]" *Chacko*, 429 F.3d at 509.  "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original

complaint may be maintained in a subsequent lawsuit." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). Administrative charges "must be construed with utmost liberality," but courts are not "at liberty to read into administrative charges allegations they do not contain." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013) (quoting *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988)) (internal quotation marks omitted).

In preparing his charge of discrimination, Lambert provided information to an EEOC intake officer who filled out the charge. Lambert then digitally signed the document. The charge asserted only race and national origin discrimination: "I believe that I have been discriminated against because of my race (black) and national origin (Cameroon), . . . with respect to denial of transfer and discharge." ECF 46-28. The boxes for sex and color discrimination are not checked, and the narrative summary does not mention sex or color discrimination. Lambert never sought to amend the charge. Rosemarie Rhodes, the Director of the EEOC's Baltimore Field Office, has submitted a declaration in which she states the fault for the omission lies with the EEOC. ECF 51-4. Rhodes says that Lambert's intake notes indicate he advised the intake officer that he had been discriminated against based on his sex and color in addition to his race and national origin. *Id.* ¶ 4. Rhodes urges the Court not to penalize Lambert because the intake officer did not record his claims correctly. *Id.* ¶ 7.

While the Court is sympathetic to Lambert's position and appreciates Rhodes' candor, the law is clear that the Court cannot look beyond the charge of discrimination to assess whether a plaintiff has exhausted his claims. *Balas*, 711 F.3d at 408 ("In determining what claims a plaintiff properly alleged before the EEOC, we may look only to the charge filed with that agency."). The two purposes of the exhaustion requirement are to provide employers with notice of the claims so they may conduct their own investigations and "attempt to resolve any discriminatory actions

21

internally[,]" and to promote administrative conciliation, thereby encouraging "quicker, less formal, and less expensive resolution of disputes." *Id.* at 407. In light of these purposes, the Fourth Circuit in *Balas* refused to consider the contents of letters sent by a plaintiff to the EEOC before formal charges were filed, where the letters included allegations beyond those in the formal charge. *Id.* at 408. The Court reasoned that because the employer was never apprised of the contents of the letters, "the point at which they were written makes no difference for the goals of putting [the] employer on notice or encouraging conciliation." *Id.* The Court concluded that "persons alleging discrimination have a different form of recourse if they determine that their initial charge does not read as they intended: they may [] file an amended charge with the EEOC." *Id.* Adhering to *Balas*, other courts in this circuit have similarly refused to look beyond a charge to the information that informed it. *See, e.g.*, *Sakalosh v. BMW Mfg. Co.*, No. 7:20-cv-4306-TMC-KFM, 2021 WL 5150012, at *4–5 (D.S.C. Nov. 5, 2021) (dismissing claims as unexhausted and stating "courts cannot consider *private* letters or communications between a claimant and the EEOC to bootstrap allegations not included in the Charge into a federal action"); *Brown v. Univ. of N.C. Health Care Sys.*, 1:20-CV-0086, 2021 WL 512222, at *8 (M.D.N.C. Feb. 11, 2021) (refusing to consider claims alleged in plaintiff's initial EEOC inquiry that were not included in the charge) ; *Brown v. Target, Inc.*, No. ELH-14-950, 2015 WL 2452617, at *6–7 (D. Md. May 20, 2015) (refusing to consider allegations in intake questionnaire as part of the employee's EEOC charge); *Pruitt v. Peninsula Reg'l Med. Ctr.*, No. GLR-14-344, 2014 WL 2916863, at *6–7 (D. Md. June 25, 2014) (dismissing claims included in intake questionnaire but not in EEOC charge).

Lambert's only response is that this case is distinguishable from *Balas* because of Rhodes' declaration. This argument is not persuasive. *Balas* involved an analogous situation—the plaintiff in that case wanted the court to consider the contents of her intake questionnaire and two letters

she submitted to the EEOC before the EEOC drafted her charge.  *Balas*, 711 F.3d at 406–07.  The Fourth Circuit refused to do so.  *Id.* at 408.  Nothing suggests the panel would have ruled the other way if the plaintiff had produced evidence similar to Rhodes' declaration.  It was a reasonable and obvious inference from the facts in *Balas* that the EEOC was responsible for the omission since it drafted the plaintiff's charge.  Lambert does not cite precedent supporting the proposition that the EEOC's mistaken omission of a plaintiff's claims from his charge of discrimination is grounds to bypass Title VII's exhaustion requirement, regardless of whether the EEOC admits responsibility.

Lambert's EEOC charge of discriminatory transfer denial and termination was based only race and national origin.  Lambert signed the charge and never sought to amend it.  The investigation proceeded on the grounds identified in the charge.  Accordingly, Lambert has not exhausted his sex and color discrimination claims, and the defendants are entitled to summary judgment on those claims.

### 2.  *Prima facie* discrimination

Lambert has exhausted his race and national origin discrimination claims based on his termination and transfer denial.  To establish a *prima facie* case of discriminatory refusal to transfer, a plaintiff must show (1) he is a member of a protected class, (2) there was an open position for which he applied, (3) he was qualified for the position, and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination.  *Evans*, 80 F.3d at 959–60.  A *prima facie* case of discriminatory discharge consists of evidence that (1) the plaintiff is a member of a protected class, (2) he was discharged, (3) his job performance was satisfactory, and (4) he was terminated under circumstances giving rise to an inference of unlawful discrimination.  *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).  Circumstances suggesting

23

unlawful discrimination include disparate treatment compared to similarly situated employees who do not share the plaintiff's protected traits.  *Id.*

There is no dispute that Lambert is a Black, African American from Cameroon and that he was refused transfer to a vacant position and discharged.  The parties focus their arguments on the third and fourth elements of a *prima facie* case of discriminatory transfer denial and discharge, both of which overlap in this case.[4]  As to the third element, the Court need not decide whether Lambert has submitted evidence that his performance was satisfactory and that he was qualified for the position he sought transfer to.  This is because, as to the fourth element, Lambert has failed to produce evidence on which a reasonable jury could conclude that the circumstances of the transfer denial and termination give rise to an inference of race or national origin discrimination.

Lambert builds his case for discrimination on several potential comparators: (i) Neel, who is white and American-born and who received two opportunities to transfer despite the purported problems at Patuxent; (ii) several white, American-born Directors of Nursing at other facilities (Deborah Abbey, Laura Wright-Waterman, and Vernan Russell), who were given the option to transfer despite performance problems; and (iii) additional white, American-born Directors of Nursing (Carmen Morgan, Carol Brown), who were not terminated despite performance problems. When, as here, a plaintiff's claims are based on comparisons to other employees, the plaintiff must show the comparators are similarly situated.  *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019); *see also McDonnell Douglas*, 411 U.S. at 804 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.").  "[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as

---

[4] There appears to be no dispute that the qualifications and expectations for the job Lambert lost and the job he sought transfer to were identical.  And, according to Rawlins' undisputed testimony, the refusal to transfer Lambert and the decision to terminate him were made for identical reasons.

differing roles, performance histories, or decision-making personnel." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008).  The compared jobs need only be "similar" rather than "equal," and courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Spencer*, 919 F.3d at 207 (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005)) (internal quotations omitted).  Still, "the plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all respects*.'"  *Id.* at 207–08 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

It is undisputed that Neel was Lambert's supervisor, that she had different responsibilities than he, and that her job had different qualifications than his.  Lambert's arguments that Neel is a similarly situated comparator because she, too, was ultimately supervised by Rawlins and criticized by the Family Council ignore the numerous, obvious distinctions between their jobs and qualifications.  There can be no dispute that Neel is not a similarly situated comparator.  The fact that she was offered transfers does not support an inference that the denial of Lambert's transfer request and his termination were the result of discrimination.

Beyond Neel, Lambert identifies five other potential comparators.  While it is undisputed each was similarly employed by SSC as a Director of Nursing, Lambert has not produced evidence showing any were otherwise similarly situated to him.  Regarding the employees Lambert claims were transferred despite similar or worse performance, the defendants produced evidence showing Russell transferred in October 2017; Wright-Waterman transferred in June 2018 and took a demotion; and Abbey transferred first in April 2015 and again in October 2017, both times taking

a demotion, and transferred a third time in July 2019.  ECF 46-9.  Lambert does not dispute this

evidence.  Nor does he dispute that Rawlins did not join SSC until December 2018.  Thus, Russell

and Wright-Waterman were not supervised by Rawlins at the time of their transfer or retention,

and Abbey had a different supervisor for her first two transfers.  *See* ECF 51, at 40 (Lambert's

brief stating, without citation, that Wright-Waterman, Russell, and Abbey "all had the same

supervisor – [Richie] McAlevy, . . . who left Defendant's employment in October 2018").  This

fact is particularly relevant because Rawlins testified he would not transfer an employee who

performed poorly, and Lambert has not produced evidence disputing that testimony or suggesting

the supervisor who approved these employees' transfers imposed similar performance standards.

So, the only proposed comparator with the potential to have the same supervisor as Lambert

at the time of her transfer is Abbey, who transferred in 2019 after Rawlins joined SSC.  But

Lambert has not cited evidence that Abbey—or Russell or Wright-Waterman—were subject to the

same standards as he was, had similar qualifications, experience, and responsibilities, and

performed similarly or worse than he did under similar circumstances.  Lambert refers to "Health

Inspection Survey results inclusive o[f] period ending 2/3/2019" and "independent knowledge,

publicly provided by the US government" that "he performed much better than his white Caucasian

American female Co-DONs," ECF 51, at 43, but he does not tell the Court where to find this

information in the record.  The Court reviewed the entire record but did not find anything beyond

Lambert's own testimony, emails indicating concerns with two other SSC facilities in March and

June 2018, ECF 61-36, at 35–38, and 2019 CMS star ratings for different SSC facilities, ECF 51-

8, at 14–21.  Even assuming this information connects to one or more of the proposed comparators

at the relevant times, nothing suggests it was a factor in the decisions to approve their transfer

requests.  Indeed, CMS star ratings evidently did not factor in the assessment of Lambert's

performance at all.   Moreover, the information concerns SSC's facilities, not the employees themselves.   Ultimately, Lambert has not submitted any evidence of the proposed comparators' traits, qualifications, responsibilities, or performance.

The record similarly is devoid of information about the two Directors of Nursing Lambert claims performed worse than he did but were not terminated, Brown and Morgan.   According to unrefuted evidence submitted by the defendants, Morgan was hired in August 2017 and Brown in June 2018.   ECF 46-9.   Here again, Lambert provides only his own testimony and facility-level information to support his claim that these were similarly situated comparators.   While it is possible there is other evidence bearing on the performance of these individuals somewhere in the record, Lambert has not identified it, and it is not incumbent upon the Court to seek it out when a party has failed to cite to it.   *See* Fed. R. Civ. P. 56(c)(1)(A) & (c)(3); *see also Jurgensen v. Albin Marine, Inc.*, 214 F. Supp. 2d 504, 510 (D. Md. 2002) (stating the Court "'is not required to scour the record looking for factual disputes'") (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)).

While "plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim[,]" when, as here, a plaintiff bases his allegations on "a comparison to an employee from a non-protected class," summary judgment is appropriate if the plaintiff fails to "show their comparator was similarly situated[.]"   *Haywood v. Locke*, 387 F. App'x 355, 359–60 (4th Cir. 2010) (unpublished) (per curiam); *see also Spencer*, 919 F.3d at 207.   Lambert has not produced evidence that the comparators he identifies were similarly situated to him in all respects.   *See Spencer*, 919 F.3d at 207–08.   Thus, he cannot show that a similarly situated employee was treated more favorably than he was.   No reasonable jury could conclude

the denial of Lambert's transfer request or his termination were motivated by his race or national origin.  The Court grants summary judgment on Count I in favor of the defendants.

### C.  Count II – Title VII Hostile Work Environment

Lambert claims he was subjected to a hostile work environment based on his protected traits.  A hostile work environment exists when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment[.]'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).  Hostile work environment claims under Title VII are subject to the statute's exhaustion requirement.  *Chacko*, 429 F.3d at 513.  Lambert did not indicate on his EEOC charge of discrimination that he intended to pursue a hostile work environment claim.  While there is no "hostile work environment" box to check on the charge of discrimination, the narrative summary of Lambert's claims refers only to discriminatory refusal to transfer and discharge.  Lambert has not exhausted his Title VII hostile work environment claim.  *See id.* at 509; *Balas*, 711 F.3d at 408. The Court grants summary judgment on Count II in favor of the defendants.

### D.  Count III – Title VII Retaliation

Lambert claims in the alternative that his discharge was retaliation for reporting Dr. Evans' allegedly hostile behavior towards him.  Title VII proscribes discrimination against an employee because he "has opposed any practice made an unlawful employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a).  "Employees engage in protected oppositional activity when, inter alia, they 'complain to their superiors about suspected violations of Title VII.'"  *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003)).  Title VII's exhaustion requirement also extends to retaliation claims under the statute when the alleged retaliation predates the filing of the

EEOC charge. *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 416–17 (4th Cir. 2014); *see also Stewart v. Iancu*, 912 F.3d 693, 706 (4th Cir. 2019). Lambert did not check the box for retaliation on his EEOC charge. The allegations in his charge did not mention retaliation or his report of Dr. Evans' behavior to Vann, the protected activity he now claims prompted the retaliation. Lambert has not exhausted his Title VII retaliation claim. *See Chacko*, 429 F.3d at 509; *Balas*, 711 F.3d at 408. The Court grants summary judgment to the defendants on Count III.

### E.  Count IV – § 1981 Disparate Treatment

Lambert asserts a claim under 42 U.S.C. § 1981 for disparate treatment, based on his race, in the denial of his transfer request and his termination. Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as enjoyed by white citizens." The phrase "make and enforce contracts" includes the enjoyment of "'all benefits, privileges, terms, and conditions' of contractual employment relationships." *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (quoting 42 U.S.C. § 1981(b)). Like Title VII claims, claims under § 1981 are subject to the *McDonnell Douglas* burden-shifting framework, and "the elements of the required prima facie case are the same." *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285–86 (4th Cir. 1985) (citing cases). Unlike claims under Title VII, claims under § 1981 are not subject to an administrative exhaustion requirement. *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 334 (4th Cir. 1983).

As explained above, Lambert has not put forward evidence of similarly situated comparators and cannot establish a *prima facie* case of disparate treatment based on his race. The defendants are entitled to summary judgment on Count IV.

**F.  Count V – § 1981 Hostile Work Environment**

Lambert asserts a race-based hostile work environment claim under § 1981.  As with disparate treatment, a hostile work environment claim under § 1981 mirrors one under Title VII, and the same test applies.  *Boyer-Liberto*, 786 F.3d at 277.  To prevail on a race-based hostile work environment claim, a plaintiff must show "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive environment; and (4) which is imputable to the employer." *Id.* (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)) (internal quotation marks omitted).  The defendants argue the record does not support the existence of race-based harassment that was sufficiently severe or pervasive.  Lambert counters that he has provided sufficient evidence to meet his burden.

The Court finds that, based on the record evidence, no reasonable juror could conclude that Dr. Evans' conduct, even if motivated by racial animus towards Lambert, was sufficiently severe or pervasive to alter Lambert's conditions of employment and create an abusive work environment. To determine whether conduct qualifies as severe or pervasive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 414 (4th Cir. 2022) (quoting *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010)) (internal quotation marks omitted).  The severe or pervasive element "has both a subjective and objective component." *Perkins*, 936 F.3d at 208.  The subjective component may be met by the testimony of the complaining witness. *Webster*, 38 F.4th at 414 (quoting *EEOC v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001)).  The objective component requires the plaintiff to

show that "a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." *Id.* (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)) (internal quotation marks omitted).  The Fourth Circuit has recognized that this sets a high bar.  *Id.* (quoting *Sunbelt Rentals*, 521 F.3d at 315–16).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Likewise, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor . . . are not actionable under Title VII." *Sunbelt Rentals*, 521 F.3d at 315–16 (internal quotation marks and citations omitted).

The harassment Lambert complains of occurred on one day, February 13, 2019.  Lambert had four interactions with Dr. Evans that day.  The first interaction was an hours-long meeting to review Patuxent's PIPs.  Dr. Evans asserted various failures, including that residents had not been receiving showers or regular podiatry care and that she could not find documentation for those care areas.  Lambert disputed her assertions and provided documentation.  Afterwards, Dr. Evans met Lambert in his office and requested a copy of the podiatry list, which he provided to her.  Later that day, while Lambert was meeting with Neel in Neel's office, Dr. Evans interrupted their conversation and angrily demanded Lambert go retrieve more documentation.  Lambert recalled that she specifically accused him of lying about the documentation.  When Lambert stood up, Dr. Evans walked towards him in a manner that Neel described as emphatic, and Lambert stepped backwards.  Finally, about thirty minutes after the interaction in Neel's office, Dr. Evans came to Lambert's office and accused him of lying to her face and on the documentation.

Three incidents of angry, work-related criticism and one instance where Dr. Evans invaded Lambert's personal space are not severe or pervasive harassment.  Dr. Evans' behavior was not pervasive because it occurred over the course of hours, not weeks or months.  And while even a single incident of severe harassment can in some instances create a hostile work environment, Dr. Evans' behavior was not the kind of severe racial hostility or physically threatening conduct that courts have determined meets this standard.  Lambert suggests the facts in *Boyer-Liberto* are analogous.  The Court disagrees.  The harassment in *Boyer-Liberto* involved a supervisor's use of a racial epithet, which courts uniformly recognize as "degrading and humiliating in the extreme." *Boyer-Liberto*, 786 F.3d at 280 (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)).  The Fourth Circuit held that two instances of the use of such language was sufficiently severe harassment.  *Id.*  Rather than extremely serious harassment of this sort, Dr. Evans' behavior is representative of office disputes that courts have excised from the scope of workplace discrimination statutes.  "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Sunbelt Rentals*, 521 F.3d at 315.  Both the Fourth Circuit and other courts in this circuit have previously rejected hostile work environment claims arising from more serious harassment than complained of here.  *See, e.g.*, *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (unpublished) (per curiam) (affirming dismissal of hostile work environment claim where the plaintiff alleged a supervisor mockingly yelled at the plaintiff, yelled and pounded her hands during a meeting, repeatedly criticized the plaintiff, made snide comments to the plaintiff, and unfairly scrutinized the plaintiff's compliance with directives); *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006) (holding "rude treatment" by colleagues, including one agitated interaction, was not severe or pervasive harassment); *Lubula v. Rex Healthcare, Inc.*, No.

5:13-CV-822-BO, 2015 WL 11120503, at *2 (E.D.N.C. Mar. 3, 2015), *aff'd sub nom. Lubula v. Rex Healthcare*, 620 F. App'x 207 (4th Cir. 2015) (unpublished) (granting summary judgment to defendants where the harassment complained of involved the use of foul language and false accusations); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (unpublished) (granting summary judgment to employer where the employee complained of repeated criticism and an incident where a supervisor yelled at her, told her she was incompetent, pushed her down in her chair, and blocked the door).

Because no reasonable jury could conclude that Dr. Evans' behavior was sufficiently severe or pervasive to alter the conditions of Lambert's employment and create an abusive work environment, the Court grants the defendants summary judgment on Count V.

### G.  Count VI – § 1981 Retaliation

As with his disparate treatment and hostile work environment claims, Lambert makes a parallel retaliation claim under § 1981.  The *McDonnell Douglas* framework also applies to § 1981 retaliation claims.  *Guessous*, 828 F.3d at 216.  To establish a *prima facie* retaliation claim and progress to the next step of the *McDonnell Douglas* framework, Lambert must prove (1) that he engaged in a protected activity (such as complaining about suspected employment discrimination), (2) that the defendants took an adverse employment action against him, and (3) that the two events were causally linked.  *See Boyer-Liberto*, 786 F.3d at 281 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)).  Establishing a causal relationship at the *prima facie* stage "is not an onerous burden" and can be accomplished by, among other possibilities, showing that "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity."  *Strother v. City of Laurel, Md.*, 895 F.3d 317, 336 (4th Cir.

2018).  If the employer provides a non-retaliatory reason for the adverse action, the burden returns to the plaintiff to establish the employer's stated reason is pretext and "that retaliation was a but-for cause of a challenged adverse employment action." *Guessous*, 828 F.3d at 217 (quoting *Foster*, 787 F.3d at 252) (internal quotation marks omitted).  "[A] cause need not work in isolation to be a but-for cause." *Id.*  At this final step, the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions"—the question is whether the stated reason is authentic, not whether it is wise or correct.  *DeJarnette*, 133 F.3d at 299 (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)) (internal quotation marks omitted).

Relevant to causation, the Fourth Circuit "consistently [has] required proof of a decisionmaker's knowledge of protected activity to support a [] retaliation claim." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021).  Because "an employer cannot take action [on account of] a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of a *prima facie* case [of retaliation]." *Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).  In *Roberts*, the Court held a plaintiff had no retaliation claim because he had not presented evidence that the sole decisionmaker "knew he had been subjected to or had complained of harassment when [the decisionmaker] decided to terminate his employment." *Id.* at 125.  The decisionmaker disclaimed knowledge, and "no evidence in the record contradict[ed] his denial." *Id.*  While it was undisputed the plaintiff reported harassment to three supervisors, including the vice president of the company (who was also the decisionmaker's wife and the person in charge of Human Resources), there was no evidence "those who received the complaints reported them to [the decisionmaker] or were later involved in the termination

decision." *Id.* at 126.  The Court concluded "[plaintiff's] burden here requires more evidence than mere curious timing coupled with speculative theories about discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity that create only a speculative inference regarding a decisionmaker's awareness." *Id.* (quoting *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017)) (internal quotation marks and citations omitted).

There is no dispute that Lambert reported Dr. Evans' behavior on February 13 to Vann and that he was terminated later that same day.  The defendants argue, first, that Lambert cannot establish *prima facie* retaliation because Rawlins, the person defendants claim made the decision to terminate Lambert, was not aware of Lambert's complaint against Dr. Evans.  The defendants argue further that, even if Lambert can meet his *prima facie* burden, he cannot establish but-for causation between his report of Dr. Evans' conduct to Vann and his termination because the evidence shows he was terminated for poor performance and a lack of any indication that he was willing to improve.

The flaw in the defendants' first argument is that the record shows that Vann was heavily involved in the termination decision.  Rawlins testified that he, Hallissey, Vann, and Dr. Evans made the decision to terminate Lambert as a committee.  Because Rawlins lacked clinical expertise, he relied on the assessments of Vann and Dr. Evans in particular.  He met with the clinicians at Patuxent hours before Lambert was terminated and asked Vann to prepare a written summary of the team's findings, which Vann emailed that afternoon.  He stated, "[t]he decision to terminate [Lambert] came *once I was gone from the building*.  I was traveling, and *the decision was made* that there was not an indication from him that he intended to improve."  ECF 46-22, at 7 (16:18 – 17:12) (emphasis added).  This case is unlike *Roberts*, where it was undisputed that the sole decisionmaker did not know about the protected activity when he terminated the employee.

35

Here, there is a genuine dispute as to who made the decision to terminate Lambert.  A reasonable jury could find that Vann was "involved in the termination decision" because the decision was made by a committee that included her.  *See Roberts*, 998 F.3d at 126.

If the jury found the committee, and not solely Rawlins, made the decision to terminate Lambert's employment, there is evidence on which it reasonably could conclude that Lambert was terminated because he reported harassment.  Unlike in *Roberts*, where the plaintiff's complaint and the termination decision were separated by months, Lambert's complaint to Vann about Dr. Evans' behavior preceded the committee's decision to terminate him by only a few hours.  *See id.* at 127.  This timing suggests the possibility that Lambert's report of harassment was a reason for his termination.  *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021) ("We have made it abundantly clear that temporal proximity suffices to show a [*prima facie*] causal relationship."); *Strothers*, 895 F.3d at 337 (stating "one or even nine days is well-within what this Court has found to be a causally significant window of time" for a *prima facie* retaliation analysis).  This suggestion is bolstered by the testimony of Lambert and Neel, who said that Vann praised them during the PIP review meeting earlier that day.  In sum, a reasonable jury could conclude Lambert has established a *prima facie* case of retaliation.

The defendants have provided evidence that Lambert's termination was motivated by a legitimate, non-retaliatory reason—his poor performance and unwillingness to improve—so the Court proceeds to the third step of *McDonnell Douglas*: whether the employer's reason is pretext for retaliation.  The defendants claim Lambert was terminated as the result of an investigation conducted by SSC clinicians during his FMLA leave.  But the defendants' evidence—testimony from Rawlins, Vann, and Hallissey, documentation of the Family Council's concerns about Patuxent, and the conclusions Vann emailed to Rawlins—is contradicted by other evidence in the

record that casts doubt on the methodology and conclusions of the investigation into Lambert's performance.   Lambert testified that he produced the podiatry and bathing documentation requested by Dr. Evans at the PIP meeting.   Neel corroborated Lambert's account.   More importantly, Neel testified not only that Lambert was performing well, but also that she did not recall the clinicians visiting Patuxent when they said they did, that she did not hear any complaints from them regarding Lambert before February 13, and that the podiatrist in fact visited Patuxent regularly.   Both Neel and Lambert testified Vann praised their performance at a meeting on February 13, calling into question the conclusions Vann reported via email that afternoon.   As discussed above, Lambert's termination happened within hours of his protected activity.   Finally, the defendants did not initially provide Lambert with a reason for his termination.   The Fourth Circuit has held similar evidence created a genuine dispute of material fact regarding whether an employer's stated reason was pretextual.   *See, e.g.*, *Foster*, 787 F.3d at 253–54 (denying summary judgment on retaliation claim where the employee provided evidence from her direct supervisor contradicting the employer's stated reason and praising her performance, where person involved in the termination decision had recently praised her work, and where the employer did not initially provide a reason for her termination).

The defendants urge the Court to disregard Neel's testimony, arguing what Lambert's "co-workers" thought of his performance is irrelevant.   ECF 53, at 27 (citing *DeJarnette*, 133 F.3d at 299).   While the Fourth Circuit has held that "it is the perception of the decision maker which is relevant," *DeJarnette*, 133 F.3d at 299, and that coworker opinion testimony is "close to irrelevant," *id.* (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991)), those holdings concern opinions about the employee's performance.   Neel—who was Lambert's supervisor—testified regarding not only her opinion of Lambert's performance, but also

her recollection of the clinicians' investigation of Patuxent and Vann's praise of Lambert on the day of his termination.   Rather than merely present a conflicting opinion on Lambert's performance, Neel's testimony calls into the question the authenticity of the basis for his termination as represented by those responsible for the decision.   Testimony of this sort is relevant to whether the employer's stated reason for termination is pretext.   *See Foster*, 787 F.3d at 253–54 (considering similar testimony from the employee's immediate supervisor and scheduler).   A reasonable jury could conclude either that Lambert was terminated because of his poor performance and unwillingness to improve or that the defendants' stated reason is pretext for retaliatory termination.

Because there are genuine disputes of material fact as to who made the decision to terminate Lambert and the authenticity of the defendants' stated reason for his termination, neither party is entitled to summary judgment on Count VI.

### H.  Count VII – MFEPA Violations

Lambert asserts race-based disparate treatment and harassment in violation of the Maryland Fair Employment Practices Act.[5]  "The Maryland Court of Appeals has deemed [M]FEPA to be the state law analogue of Title VII, and has noted that Maryland courts 'traditionally seek guidance from federal cases in interpreting Maryland's [MFEPA].'"   *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *4 n.3 (D. Md. Sept. 28, 2011) (quoting *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007)).   This Court has often applied Title VII case law, including the *McDonnell Douglas* burden-shifting framework, to MFEPA claims.   *See, e.g.*, *id.*; *Schmidt v. Town of Cheverly, Md.*, 212 F. Supp. 3d 573, 579–80

---

[5] While the header for the MFEPA claim in Lambert's amended complaint refers to race, national origin, color, and sex, the allegations themselves concern only disparate treatment and harassment based on Lambert's race.   *See* ECF 27, ¶¶ 214–29.

(D. Md. 2016) (concluding MFEPA claim failed "for the same reasons" the plaintiff's Title VII claim failed); *Williams*, 86 F. Supp. 3d at 408 n.1 ("[F]or purposes of this memorandum, this Court's analysis of [the plaintiff's] Title VII claims shall constitute its analysis of her MFEPA claims.").  Additionally, the MFEPA contains an exhaustion requirement that is satisfied by a "timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice by the respondent."  Md. Code Ann., State Gov't § 20-1013(a).

Neither party has identified any applicable differences between the state and federal statutes, and the Court is aware of none, so the Court's MFEPA analysis mirrors its Title VII analysis.  As discussed above, Lambert did not claim a hostile work environment in his EEOC charge of discrimination.  He does not claim to have filed any other administrative charge or complaint.  Thus, his MFEPA claim based on workplace harassment has not been exhausted.  His disparate treatment claim fails because he has not offered evidence of similarly situated comparators or otherwise established a genuine dispute of material fact that the circumstances of his termination support an inference of unlawful discrimination.  The Court grants the defendants summary judgment on Count VII.

## I.   Count VIII – Intentional Infliction of Emotional Distress

Lambert claims the defendants intentionally inflicted emotional distress on him by terminating him shortly after the premature birth of his triplets, which caused him to lose his health insurance and suffer anxiety, stress, and depression.  To prove a claim for intentional infliction of emotional distress ("IIED") under Maryland law, a plaintiff must show (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) that the emotional distress was

severe. *Burgess v. Goldstein*, 997 F.3d 541, 554 n.5 (4th Cir. 2021) (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).

The standard for IIED is very difficult to meet. Maryland courts have cautioned that liability for this tort "should be imposed sparingly and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'" *Haines v. Vogel*, 249 A.3d 151, 163 (Md. Ct. Spec. App. 2021) (quoting *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991)); *see also Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995) (noting that IIED is "difficult to satisfy"). Likewise, this Court has observed that "claims for IIED are disfavored, difficult to establish and, as such, 'rarely viable'" in Maryland. *Respess v. Travelers Cas. & Sur. Co.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011); *see also Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997), *aff'd*, 166 F.3d 1208 (4th Cir. 1998); *B.N.S. by Stuart v. Brito*, No. ELH-17-2670, 2018 WL 5830565, at *9 (D. Md. Nov. 6, 2018).

The defendants argue that, based on the record evidence, Lambert cannot establish the second or fourth elements of IIED. The Court agrees. To satisfy the second element, the offending conduct must rise to the level of "completely violat[ing] human dignity," and merely insensitive or rude conduct does not suffice. *Jones v. Family Health Ctrs. of Balt., Inc.*, 135 F. Supp. 3d 372, 383 (D. Md. 2015). The conduct "'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat*, 32 F. Supp. 2d at 248 (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986)). The rare cases where claims of IIED have been sustained in Maryland involved conduct such as a couple's counselor engaging in a sexual relationship with the plaintiff's spouse, *Figueiredo-Torres*, 584 A.2d at 77; an HIV-positive surgeon performing surgery without informing the recipients he had the disease, *Faya v. Almaraz*, 620 A.2d 327 (Md. 1993); a physician having sex

40

with a nurse without informing her that he had herpes and infecting her, *B.N. v. K.K.*, 538 A.2d 1175 (Md. 1988); and a workers' compensation insurer insisting that the plaintiff submit to a psychiatric evaluation in order to force her to drop her claim or commit suicide, *Young v. Hartford Accident & Indem. Co.*, 492 A.2d 1270 (Md. 1985).

In contrast, the conduct here does not rise to the level of completely violating human dignity.  The record shows that the defendants terminated Lambert several months after the premature birth of his triplets, at a time when he had returned to work after two FMLA leave periods but anticipated taking additional intermittent leave to care for his family.  Lambert's termination did cause him to lose his family's health insurance because he could not afford to pay for the expensive monthly premium for continuation of coverage under COBRA.  However, Lambert secured insurance through Medicaid less than three months after he was terminated. There is no evidence that he or his family suffered lasting harm because of his termination and temporary loss of health insurance.  An employer's decision to terminate an employee, even at a difficult time in the employee's life, simply does not rise to the level of outrageousness necessary to sustain a claim of IIED under Maryland law.  *See Lewis-Davis v. Bd. of Educ. of Balt. Cnty.*, No. ELH-20-423, 2021 WL 4772918, at *18 (D. Md. Oct. 13, 2021) (holding workplace harassment and "termination from employment, without more," did not rise to the level of IIED).

Lambert also cannot satisfy the fourth element of IIED.  This element requires the emotional distress be so extreme that "no reasonable person could be expected to endure" it, such that it renders one "unable to function" and "tend to necessary matters."  *Hamilton*, 502 A.2d 1064−65; *see also Jones*, 135 F. Supp. 3d at 383.  Lambert submitted evidence showing he was diagnosed with anxiety and depression and prescribed medication after his termination.  He testified that he suffered symptoms including loss of sleep, anxiousness, thoughts of suicide, high

blood pressure, and headaches.  But he also testified that after his termination, he found a new job, enrolled in Medicaid, and retained an attorney to negotiate his severance.  Based on his own testimony, he was able to function and tend to necessary matters.  This Court recently held a plaintiff with similar levels of distress failed to establish the severe distress necessary to submit an IIED claim to a jury.  *See Hale v. Mayor & City Council of Balt. City*, No. SAG-20-503, 2022 WL 374512, at *11 (D. Md. Feb. 8, 2022) (granting summary judgment to defendants on IIED claim where the plaintiff began feeling a loss of control and was diagnosed with anxiety after distressing incidents).

Because Lambert has not identified record evidence giving rise to a genuine dispute of material fact that the defendants' conduct was extreme and outrageous and that his emotional distress was severe, no reasonable jury could find for Lambert on his IIED claim.  The Court grants summary judgment to the defendants on Count VIII.

### J.  Count IX – FMLA Interference with Rights

Lambert claims the defendants unlawfully interfered with his FMLA rights by terminating him five days after he returned to work from a period of FMLA leave and while a request for future leave was pending.   Under the FMLA, eligible employees are "entitled to a total of 12 workweeks of leave during any 12-month period" for certain covered life events.  29 U.S.C. § 2612(a)(1).  Further, "any eligible employee who takes leave" pursuant to § 2612 is entitled "on return from such leave (A) to be restored by the employer to the position held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."  29 U.S.C. § 2615(a)(1).

To establish an interference claim under the FMLA, an employee must demonstrate that "(1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) [the] interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). This Court has sometimes presented these elements in a different way:

> [A] plaintiff must prove that (1) she was an eligible employee; (2) her employer was a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; (5) the employer denied her FMLA benefits to which she was entitled; and (6) the violation prejudiced her in some way.

*Smith v. Caesars Balt. Mgmt. Co.*, No. ELH-17-3014, 2019 WL 3766529, at *11 (D. Md. Aug. 9, 2019) (quoting *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015)); *see also Snyder v. Md. Dep't of Transp.*, No. CCB-21-930, 2022 WL 980395, at *6 n.8 (D. Md. Mar. 31, 2022) (noting the different formulations).

Under either formulation, the defendants argue they are entitled to summary judgment because the record evidence establishes that Lambert's termination was unrelated to his exercise of his FMLA rights. The Fourth Circuit has held that "the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 547 (4th Cir. 2006). Likewise, "[a]n employer has discretion to discipline or terminate the employment of an at-will employee for poor performance regardless of whether the employer's reason for terminating the employment was discovered while the employee was taking FMLA leave." *Mercer v. Arc of Prince George's Cnty., Inc.*, 532 F. App'x 392, 396 (4th Cir. 2013) (unpublished) (per curiam); *see also Burcar v. S. Wash. Cnty. Sch. Dist. 833*, No. 12-2188 (DSD/JJG), 2014 WL 67954, at *6 (D. Minn. Jan. 8, 2014) ("It is well-settled that the fact that an employee has taken FMLA leave does not insulate

him from termination or a decision by the employer not to restore him to his prior or an equivalent position for reasons unrelated to the FMLA.").  Essentially, if Lambert was terminated for reasons unrelated to his FMLA leave, his FMLA interference claim fails.  *See Gill v. Genpact, LLC*, No. 1:17-CV-454 (LMB/JFA), 2017 WL 5319938, at *8 (E.D. Va. Nov. 13, 2017) (considering FMLA interference theories nearly identical to Lambert's and granting summary judgment to employer because undisputed facts established the plaintiff's "termination was unrelated to his request for potential future leave"); *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018) ("Where the [FMLA interference] claim is based on an employee's termination, . . . an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of her request for or use of FMLA leave.") (citing *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008)).

As with Lambert's § 1981 retaliation claim, there are genuine disputes of material fact concerning whether Lambert was terminated for poor performance or whether that reason is pretext.  Lambert was granted two requests for FMLA leave, including one that stated he might require intermittent leave through the end of March 2019.  Midway through his second period of leave, Lambert notified the defendants that he would need paperwork to request a third period of intermittent FMLA leave at the end of February.  He was terminated before this third period was approved and less than a week after returning to work.  The temporal proximity between Lambert's latest request for leave (late January), his termination (February 13), and the date his requested leave would begin (end of February) is narrow.  *See King*, 328 F.3d at 151 n.5 (finding a two-and-a-half-month gap between protected activity and adverse employment action sufficiently narrow).  Further, it is undisputed that Rawlins, Vann, and Hallissey knew that Lambert had requested additional leave, and emails from the period between Lambert's request for additional leave and

his return to work indicate this knowledge may have played some role in the committee's decision to terminate Lambert without an opportunity for transfer. Immediately after receiving Lambert's transfer request in January and while Lambert was on FMLA leave, Murray notified Hallissey and Rawlins and said, "How would you like us to respond?  I know that there is lots going on here and don't want to step in any land mines."  ECF 46-27, at 2.  "[L]ots going on here" could refer to the fact that Lambert was on FMLA leave at the time of his transfer request.  In February, Rawlins stated they needed to act quickly to "deal with" Lambert's impending return from FMLA leave because, in Murray's words, Lambert's plan to be on intermittent FMLA leave "complicate[d]" things.  ECF 51-10, at 2.  While this evidence is far from a smoking gun and could be interpreted multiple ways, it is enough to create a triable issue regarding whether Lambert's termination was related to his exercise of his FMLA rights.

The defendants contend that this case is analogous to *Mercer*, 532 F. App'x 392, an unpublished Fourth Circuit case.  In that case, the plaintiff's coworkers took on her workload while she was on FMLA leave and discovered several serious errors in her past work.  *Id.* at 394.  Her employer placed her on administrative leave immediately upon her return from FMLA leave and later terminated her employment.  *Id.*  The plaintiff sought to avoid summary judgment on her FMLA interference and retaliation claims by arguing that genuine disputes of material fact existed regarding the reason for her termination.  *Id.* at 397–98.  In arguing that the employer's stated reason was pretextual, the plaintiff pointed to "the timing of her leave and the termination of her employment, her prior satisfactory performance reviews, purported shifts in [the employer's] explanation for why it was terminating her employment, and her own assessment that she adequately performed her job . . . ."  *Id.* at 398.  In affirming summary judgment for the employer, the Court reasoned the evidence of temporal proximity in that case was not enough to survive

summary judgment at the third step of the *McDonnell Douglas* framework.  *Id.* at 399.  The

plaintiff's own assessment of her performance and her earlier performance reviews were irrelevant,

and the employer's explanations for her dismissal were substantively consistent.  *Id.*

This case is distinguishable from *Mercer* because Lambert has provided evidence calling

into question the methodology Rawlins and Vann claim they used to determine his performance

was poor and the sincerity of Vann's conclusions regarding Lambert's performance.  Neel testified

that several of the specific criticisms of Lambert's performance were unfounded, that she did not

recall Vann and Dr. Evans visiting Patuxent during Lambert's absence, and that Vann praised her

and Lambert's performance in the PIP review meeting hours before Lambert's termination.  Both

parties' cross-motions for summary judgment are denied regarding Count IX. [6]

### K.  Count X – FMLA Retaliation

Lambert claims the defendants terminated him in retaliation for exercising his FMLA

rights.  In addition to the prescriptive rights that give rise to interference claims, "[t]he FMLA

provides proscriptive rights 'that protect employees from discrimination or retaliation for

exercising their substantive rights under the FMLA.'"  *Vannoy v. Fed. Reserve Bank of Richmond*,

827 F.3d 296, 304 (4th Cir. 2016) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir.

2009)).  The statute makes it "unlawful for any employer to discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful by" the FMLA.  29

U.S.C. § 2615(a)(2).  "Retaliation claims brought under the FMLA are analogous to those brought

---

[6] Lambert asserts for the first time in his reply that the defendants interfered with his rights under
29 U.S.C. § 2614(c)(1) because his termination caused him to lose his insurance.  The Court does
not address this new theory.  A party may not amend its complaint through summary judgment
briefing.  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713
F.3d 175, 184 (4th Cir. 2013); *see also Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md.
1997) (holding a plaintiff "is bound by the allegations contained in its complaint and cannot,
through the use of motion briefs, amend the complaint").

under Title VII." *Adams*, 789 F.3d at 429 (citing *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)).  Thus, retaliatory intent can be established through the *McDonnell Douglas* burden shifting framework.  *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016).  A *prima facie* case of FMLA retaliation under *McDonnell Douglas* requires proof that the plaintiff "engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity."  *Id.* (quoting *Yashenko*, 446 F.3d at 551) (internal quotation marks omitted).

As they did with the FMLA interference claim, the defendants argue Lambert's FMLA retaliation claim fails because his termination was unrelated to his exercise of his FMLA rights. Indeed, "[a]t summary judgment, [] the analyses for an FMLA interference claim based on an employee's termination and an FMLA retaliation claim are essentially the same[.]"  *Batson*, 897 F.3d at 1331.  As discussed above, there are genuine disputes of material fact concerning whether the defendants' stated reason for Lambert's termination is pretext.  Neither party is entitled to summary judgment on Count X.

## IV.    Conclusion

Genuine disputes of material fact exist that preclude summary judgment for either party on Counts VI, IX, and X.  The defendants' motion for summary judgment is granted on the remaining counts (I, II, III, IV, V, VII, & VIII), and Lambert's cross-motion is denied as to those counts.  A separate Order follows.

DATED this 29th day of July, 2022.

Deborah L. Boardman
United States District Judge